Argued and submitted May 29, affirmed September 9, reconsideration denied October 30, petition for review denied November 17, 1987 (304 Or 405)

## STATE OF OREGON,
*Respondent,*

*v.*

## NORMAN RUSSELL BAKER, JR.,
*Appellant.*

(85-825; CA A41136)

742 P2d 633

Marc D. Blackman, Portland, argued the cause for appellant. With him on the brief was Ransom, Blackman & Simson, Portland.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

WARREN, J.

## WARREN, J.

Defendant seeks reversal of his conviction in a jury trial for manslaughter in the second degree, ORS 163.125, arising out of a motorcycle accident in which the defendant was driving and his fiancee, the victim, was riding as a passenger. He assigns error to the trial court's failure to instruct the jury on assault in the fourth degree as a lesser included offense, to grant a new trial on the basis of newly discovered evidence and irregularities at trial, to admit expert testimony concerning the estimated speed at which defendant was driving at the time of the crash and to admit photographs of a sign on the road before the intersection where the accident occurred.

On July 25, 1985, defendant and his fiancee had been visiting friends near Mt. Hood. He had had several drinks before the two left for home from Timberline Lodge on defendant's motorcycle. As they approached a stop sign near Boring, defendant turned his head to talk to the victim; when he turned back, it was too late for him to avoid striking a motorcycle and colliding with a car in the intersection. The victim was thrown from the motorcycle and sustained severe head injuries.

She was hospitalized until September 18, 1985, when she was transferred to a nursing home. Although she was still comatose and had a tracheostomy tube in her throat for breathing, she had begun to improve. Her eyes could follow people in her room, and she responded to pain and even hummed to a tune on the radio. On September 26, someone removed the tracheostomy tube, and on the next day she died. No autopsy was performed.

At trial, Dr. Willeford, the house physician, testified that he had ordered the tube removed and that its removal was in no way associated with the victim's death; in his opinion, death was caused by the head injury. Dr. Misko, who had treated the victim at Emanuel Hospital, testified that in his opinion her "sudden death" after the removal of the tracheostomy tube was not consistent with death by brain injury and that she had died of respiratory obstruction. Nurse Sadoff testified that, on September 27, 1985, at 4:10 a.m., the victim was lying on her side. When Sadoff looked in on her minutes

later, she was a dusky color, without any vital signs, and she was dead.

To find defendant guilty of manslaughter in the second degree the jury had to conclude beyond a reasonable doubt that defendant "caused the death of another human being." ORS 163.005. Defendant asserts that Misko's testimony provides evidence that the victim's death was not caused by defendant, but by negligent staff care. He argues, accordingly, that there was evidence from which a jury could rationally and consistently have found him guilty of assault in the fourth degree.[1]

■ In *State of Oregon v. Garrand,* 5 Or 156 (1874), the court affirmed the trial court's refusal to instruct the jury that it could not find the defendant guilty of homicide if it found that the victim might have recovered from the wound inflicted by the defendant under proper treatment. The court stated:

> "In cases of homicide, where the wound is the *immediate cause of the death,* it is no defense that the deceased might have recovered if greater care or skill had been shown in his treatment." (Emphasis supplied.)

Defendant contends that there is evidence that the *immediate* cause of death was not the head injury but the negligent removal of the tube. It is undisputed that the victim would not have died but for the very serious injury which she had received to her head. It was that injury which made her incapable of breathing without medical intervention. We conclude that, even if there is evidence which shows that the immediate or a contributing cause of death was the negligence of the nursing home staff, that would not relieve defendant of criminal responsibility for the death, if the evidence supports

---

[1] Although assault in the fourth degree, ORS 163.160, is not a statutory lesser included offense of manslaughter, defendant asserts that, if there is evidence from which a jury could have rationally found that he assaulted the victim, but did not cause her death, he was entitled to an instruction on the lesser offense under ORS 136.465:

> "In all cases, the defendant may be found guilty of any crime the commission of which is necessarily included in that with which he is charged in the accusatory instrument or of an attempt to commit such crime."

Because we determine that there is no evidence which could reduce defendant's responsibility from manslaughter to assault, we do not decide whether, under those circumstances, a defendant would be entitled to the instruction.

a finding that the injury inflicted by defendant contributed to her death.

Defendant cites *State v. Peterson,* 270 Or 166, 526 P2d 1008 (1974), for the proposition that "legal causation" for the purpose of criminal responsibility is different from "cause in fact." We have no dispute with that premise, but we note that the facts under which the defendant in *Peterson* was held not to have caused the death of the victim "legally" were markedly dissimilar, in that the victim there was a *participant* in the mutually agreed upon activity which resulted in his death. The germane point of *Peterson,* however, is that, unlike "cause in fact," which is a question for the factfinder, "legal cause" is an element to be determined by the court after a consideration of all the policy factors which are relevant to the determination of criminal responsibility.

The most persuasive authorities indicate that one who criminally inflicts an injury upon another is responsible for that other's death, notwithstanding later negligent medical treatment, unless the medical treatment was so grossly erroneous as to have been the sole cause of death. *State v. Hills,* 124 Ariz 491, 605 P2d 893 (1980); *State v. Fierro,* 124 Ariz 182, 603 P2d 74 (1979); *State v. Sauter,* 120 Ariz 222, 585 P2d 242 (1978); *People v. Fite,* 627 P2d 761 (Colo 1981); *People v. Townsend,* 214 Mich 267, 183 NW 177 (1921); *Odeneal v. State,* 128 Tenn 60, 157 SW 419 (1913); *State v. Richardson,* 197 Wash 157, 84 P2d 699 (1938). That rule is founded on the principle that "every person is to contemplate and to be responsible for the natural consequences of his own acts." *Commonwealth v. Hackett,* 84 Mass 136, 142 (1861). The intervening negligent medical treatment is considered a foreseeable consequence of the initial act, the risk of which the defendant assumes.

■     The evidence here, when viewed most favorably to defendant, shows that, when the victim's tracheostomy tube was removed, negligently or otherwise, she could not breathe and she suffocated.[2] The removal of the tube did not cause the inability to breathe, however; the consequences of the head injury did. The chain of events ultimately causing death was

---

[2] We do not suggest that the conduct was or was not negligent.

set in motion by defendant. The injury that he caused contributed directly to causing the victim's death. As a matter of law, the claimed intervening negligence could not reduce his criminal responsibility and did not warrant the giving of an assault instruction.

After defendant's conviction, *The Oregonian* published an article about the trial. Shortly thereafter, defendant's attorney received a telephone call from an anonymous woman indicating that she had read the article and had worked as a nurse where the victim had died. She stated that, on the basis of information that she had, the testimony of Willeford and Sadoff was inconsistent with the facts as she understood them. She stated that she had heard that the victim's tube had been removed without a doctor's order. As a result of the call, defendant's attorney renewed the investigation of the matter and discovered several nursing home employes who had information.

At the hearing on defendant's motion for a new trial, there was testimony that Willeford had not ordered the removal of the tube. Willeford himself testified that he did not remember ordering the tube removed. Employes testified that, about ten minutes before the victim was found dead, she was heard making a humming and guttural noise; that, at the time when she was found, there was a detectable pulse in her wrist, knee and neck and she was warm; that the nursing staff had discussed the fact that cardiopulmonary resuscitation should be performed but that only Sadoff had the necessary training and she refused to do so. A pathologist testified that, before the trial, he had reviewed the victim's medical records and had been unable to determine the cause of death; after the new information provided during the hearing on the motion, he was able to form the opinion that the cause of death was asphyxiation. The trial court denied the motion for a new trial.

Defendant asserts that the information obtained after trial is "newly discovered evidence." ORCP 64B(4). In *State v. Williams*, 2 Or App 367, 371, 486 P2d 909 (1970), we set forth a six part test for determining whether a new trial should be granted based on newly discovered evidence:

"Newly discovered evidence which will justify a new trial:

"(1) Must be such as will probably change the result if a new trial is granted;

"(2) Must have been discovered since the trial;

"(3) Must be such as could not have been discovered before the trial by the exercise of due diligence;

"(4) Must be material to the issue;

"(5) Must not be merely cumulative of former evidence; [and]

"(6) Must not be merely impeaching or contradicting of former evidence."

In view of our conclusion on the first assignment, we agree with the trial court's determination that the new evidence would not have changed the outcome of the case, for there is no evidence that the nursing home staff's conduct, even if negligent, was the sole cause of death. The trial court acted within its discretion in denying defendant's motion for a new trial.[3]

■ The trial court excluded testimony of a forensic engineer as to the speed of defendant's motorcycle at the time it collided with the automobile, on the ground that the opinion was speculative. *See Kingsbury v. Hickey,* 56 Or App 492, 642 P2d 339, *rev den* 293 Or 146 (1982). The record indicates that the witness relied solely on police reports and photographs of the vehicles involved in the accident. He did not inspect the vehicles personally. He was unaware of the condition of the roadway at the time and place of the accident. He did not hear the witnesses' description of the accident. He assumed that defendant's motorcycle brakes were functioning fully but had no personal knowledge as to their effectiveness. He did not consider that defendant's motorcycle had collided with another motorcycle before the collision with the automobile. We conclude that the trial court acted within its discretion in excluding the offered testimony.

■ We also uphold the trial court's ruling excluding "as distorted and irrelevant" two photographs of the traffic sign,

---

[3] Defendant's assertion that the newly discovered evidence demonstrates irregularities in the testimony which, in themselves, justify a new trial, ORCP 64B(1), is based on nothing more than the idea that the new evidence tends to impeach and contradict evidence at trial. That is not sufficient to support a motion for new trial. *State v. Williams, supra,* 2 Or App at 371.

warning of a stop, located on the road defendant was traveling immediately before the accident. The photographs show the sign partially blocked by bare tree branches. Defendant asserts that they are relevant to the question of recklessness and tend to show that tree branches could have obstructed his view of the warning sign. There was no evidence, however, that the photographs were taken from where defendant was travelling on the road. Additionally, defendant's own testimony contradicts the theory on which the photographs were offered:

"Q:  [Prosecutor]: Are you saying that those branches are what caused you to not see the sign 'stop sign ahead?'

"A:  [Defendant]: I never said anything about that.

"Q:  Did those branches prevent you from seeing the sign 'stop sign ahead?'

"A:  Not really. I didn't really see the sign."

The photographs were irrelevant, and the court did not err in excluding them.

Affirmed.