979 F.2d 855
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Susan Lee PEDRO, Petitioner-Appellant,
v.
Robert SCHIEDLER, Superintendent, Oregon Women's
Correctional Center, Respondent-Appellee.
 No. 91-36006.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Sept. 14, 1992.
Decided Nov. 20, 1992.
 
 Before BEEZER, NOONAN and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 We consider whether removing a patient from life-support in violation of state law constitutes an intervening factor sufficient to break the chain of causation for the purposes of a murder conviction.
 
 
 3
 Pedro, an Oregon state prisoner, filed a petition for habeas corpus in district court challenging her jury conviction for murder. She argues that the conviction violates due process because she cannot legally be charged with causing her husband's death. She also argues that both her trial and appellate counsel provided ineffective assistance. The district court denied the petition and entered a Certificate of Probable Cause. Pedro timely appealed. We affirm.
 
 
 4
 * The unusual facts in this case warrant a brief review:
 
 
 5
 On the morning of November 28, 1983, Susan Lee Pedro ran from her house, woke the neighbors and told them that her father-in-law shot at her in bed and that she could not wake her husband.[1] Police took the father-in-law into custody while an ambulance rushed Pedro's husband, James Pedro, to the Emergency Room of the Pacific Communities Hospital in Newport, Oregon.
 
 
 6
 Doctors immediately placed James Pedro on a respirator. Dr. Peter Cookson testified that the victim appeared "completely comatose" and "totally unresponsive to all stimuli, verbal or painful." Dr. Cookson told Pedro that it was highly unlikely her husband would survive and asked whether she wished his vital organs to be donated if he should die. She responded that she wanted his life support systems maintained in the slight hope, buoyed by the doctors' explanation of the situation, that he might recover.
 
 
 7
 Dr. Cookson transmitted Pedro's husband's electroencephalogram by telephone to a neurologist in San Francisco. The neurologist opined that James Pedro was probably brain dead, but that because of telephone transmission problems, he was "unable to confirm absolutely a 'flat line' status for [James Pedro's] cerebral electrical activity."
 
 
 8
 On November 29, James Pedro's condition remained essentially the same: his heart was pumping, but he had no spontaneous respiration or detectable brain activity. Dr. Cookson and two colleagues at the hospital concluded that James Pedro was "essentially dead," and that "further life support mechanisms ... held out no hope for recovery [and] should be terminated."
 
 
 9
 The next day, Dr. Cookson made a perfunctory attempt to contact Pedro. As he testified: "I tried to call [Pedro] at home. That is really about all I really did, honestly, at the time." Dr. Cookson then conferred with Angie Conover, who was, as the doctor knew, James Pedro's ex-wife. Upon obtaining Conover's permission, the life support systems were removed.
 
 
 10
 Under Oregon law which had just gone into effect, life sustaining procedures may be withdrawn from a patient in a specified physical condition "at the request of the first of the following, in the following order, who can be located upon reasonable effort...." Or.Rev.Stat. § 97.083(2) (1983)[2] The first on the list is "the person's spouse." Or.Rev.Stat § 97.083(2)(a). Former spouses are not mentioned.
 
 
 11
 Oregon later charged Pedro with murdering her husband. She pleaded innocent, and the case went to trial. In June 1984, the jury convicted her of murder and she is currently serving a life sentence.
 
 II
 
 12
 We review de novo the district court's denial of a petition for habeas corpus relief. United States v. Popoola, 881 F.2d 811, 812 (9th Cir.1989).
 
 A. Procedural Default
 
 13
 The state contends, and the district court agreed, that Pedro procedurally defaulted on her due process claim by not raising it until her collateral state proceedings. Under Oregon law, the claim was then presumptively untimely. Or.Rev.Stat § 138.550(2) (1991).
 
 
 14
 A state court procedural default acts as a presumptive bar to federal habeas corpus review of an issue only if the state court clearly indicates that the procedural default is the basis for denying review of the claim. Harris v. Reed, 489 U.S. 255 (1989). "A predicate to the application of the Harris presumption is that the decision of the last state court to which the petitioner presented his federal claims must fairly appear to rest primarily on federal law or to be interwoven with federal law." Coleman v. Thompson, 111 S.Ct. 2546, 2557 (1991).
 
 
 15
 Pedro's post-conviction court, however, reached the merits of the case without reference to the possibility of untimeliness.[3] The Oregon Court of Appeals affirmed the post-conviction court's findings without an opinion, and the Oregon Supreme Court then denied review. Pedro v. Schiedler, 781 P.2d 876, review denied, 784 P.2d 1101 (Or.1989).
 
 
 16
 Indeed, there is nothing to suggest any Oregon court mentioned the rules regarding timely appeal of claims or analyzed Pedro's claim under anything other than the federal constitution. Thus, the Harris presumption applies: Pedro's claim is not procedurally barred.
 
 B. Due Process Claim
 
 17
 Pedro contends that her murder conviction violates due process because she did not "cause[ ] the death of another human being." See Or.Rev.Stat. § 163.005 (1991). In essence, Pedro claims that if the doctors had followed Oregon's explicit statute on the termination of life support systems, her husband would still be alive. Thus, the actions of the doctors broke the requisite chain of causation.
 
 
 18
 Oregon follows the standard common law rule that "one who criminally inflicts an injury upon another is responsible for that other's death, notwithstanding later negligent medical treatment, unless the medical treatment was so grossly erroneous as to have been the sole cause of death." State v. Baker, 742 P.2d 633, 635-36 (Or.App.) (citing cases from several states), review denied, 745 P.2d 1225 (1987). The court reasoned that the rule "is founded on the principle that 'every person is to contemplate and to be responsible for the natural consequences of his own acts.' " Id. at 636 (citation omitted). "[I]ntervening negligent medical treatment" is a foreseeable consequence. Id.
 
 
 19
 Pedro contends that the Baker rationale is inapplicable to her case because the statutory violation committed by James Pedro's doctors constitutes an intentional act that breaks the chain of causation.
 
 
 20
 Pedro's husband, however, was "essentially dead" before any action by the doctor, negligent or otherwise, took place. Shortly after his arrival at the hospital, he was "completely comatose" and "totally unresponsive to all stimuli, verbal or painful." Three doctors concluded that he was "essentially dead," and that his life support systems should be terminated. A fourth doctor stated that based on his reading of a poorly transmitted electroencephalogram, James Pedro was probably brain dead.
 
 
 21
 Under these circumstances, we cannot conclude the doctor's actions were so "grossly erroneous as to have been the sole cause of death." Baker, 742 P.2d at 636 (emphasis added). Pedro's life, if not over, was in the process of ending. However "grossly erroneous" the doctor's acts, they did not break the chain of causation.
 
 III
 
 22
 Pedro also contends that she received ineffective assistance of trial counsel in violation of the Sixth Amendment. She argues that her attorney, who had never before handled a murder case, failed to argue that Pedro could not have been the legal cause of her husband's death and failed to adequately present Pedro's substantive defense.
 
 
 23
 This court reviews de novo the question whether a defendant received ineffective assistance of counsel. Paradis v. Arave, 954 F.2d 1483, 1490 (9th Cir.1992). This analysis looks to "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984); Paradis, 954 F.2d at 1490.
 
 
 24
 For Pedro to prevail on her claim of ineffective assistance of counsel, she must show "(1) specific acts and omissions of counsel that fall below a standard of professional reasonableness, and (2) that these acts 'prejudiced' the defendant because there 'is a reasonable probability that absent the errors the factfinder would have had a reasonable doubt respecting guilt.' " Id. (citations omitted).
 
 
 25
 Pedro states that she urged her attorney to present the claim that she could not have caused her husband's death. Because we find no merit in Pedro's due process claim, we hold her attorney's failure to raise it does not constitute ineffective assistance.
 
 
 26
 Pedro also alleges six substantive errors by her trial attorney. First, Pedro argues that her trial attorney failed to adequately develop the theory that her father-in-law committed the crime.
 
 
 27
 In fact, Pedro's attorney elicited testimony that John Pedro had a good grip, could probably fire a gun at least once, sometimes walked a considerable distance, periodically expressed anger, occasionally fought others and had previously confused Pedro with his deceased wife. Pedro argues that more testimony of this nature could have been elicited. Her counsel might appropriately have concluded, however, that efforts to do so would have been cumulative or risky. For example, any helpful testimony by Pedro's brother about her father-in-law's strength and confusion might have been overshadowed by her brother's criminal record.
 
 
 28
 Second, Pedro argues that her attorney should have discredited the state's motive argument by introducing evidence that she was not in financial need. Her attorney could have introduced evidence that Pedro's previous husbands had been better off financially than James Pedro and that Pedro's income supplemented her husband's. However, her attorney could have appropriately concluded that this evidence would have little probative value given the large amount of insurance money Pedro stood to collect.
 
 
 29
 Third, Pedro argues that her attorney should have elicited more testimony from Twilla Suter, Pedro's daughter. According to Pedro, Suter would have testified that, by rubbing John Pedro's hands with a blanket, Rhonda Humbird might have unintentionally destroyed evidence that he fired the fatal shots. There is no evidence, however, indicating that Suter was near the Pedro home on the morning of the shooting. Thus, the value of her testimony is questionable.
 
 
 30
 Fourth, Pedro argues that her attorney should have had the murder weapon independently analyzed for John Pedro's fingerprints. Since police found no identifiable fingerprints on the firearm, her attorney was not remiss in leaving well enough alone.
 
 
 31
 Fifth, Pedro argues that her attorney should have moved for a change of venue "in the face of pervasive pretrial publicity." She presents no evidence of that publicity, however, and so there is no basis upon which to accept this argument.
 
 
 32
 Sixth, she argues that her attorney should have complied with her request and moved for a second continuance to allow Pedro time to obtain additional witnesses and experts. Pedro's trial attorney denied that Pedro made such a request. Moreover, Pedro provides no basis with which to evaluate the possible benefits from such a request.
 
 
 33
 None of these alleged errors, singly or combined, amount to a denial of effective representation. She has not shown any specific acts and omissions of counsel that fall below a standard of professional reasonableness. See Paradis, 954 F.2d at 1490.
 
 
 34
 Finally, Pedro also contends that she received ineffective assistance of counsel on direct appeal. She argues that appellate counsel's summary rejection of the removal of the life-support issue was not based upon a reasonable investigation of the claim and was not part of the winnowing and weeding involved in making appropriate "strategic choices" for an effective appeal. As indicated above, this claim cannot stand in the face of our holding that the due process claim has no merit.
 
 The district court's judgment is
 
 35
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or used by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The parties agree for the most part on the basic facts of the case. Where there are differences, we accept the version most favorable to the petitioner
 
 
 [2]
 Renumbered at Or.Rev.Stat. §§ 127.635-.640 (1991)
 
 
 [3]
 The court found that:
 Removal of the victim's life support system had nothing to do with and no effect on petitioner's trial[;]
 There was sufficient evidence from which the jury reasonably concluded that petitioner had murdered the victim[; and]
 Petitioner's conviction fully comports with due process of law as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution.
 Court Record 13, Ex. 114 at 2, 3.