STATE OF NEBRASKA, APPELLEE, V.
ELMORE HUDSON, JR., APPELLANT.
680 N.W.2d 603

Filed June 10, 2004. No. S-03-056.

A. Michael Bianchi, of Bianchi & Vander Schaaf, L.L.C., L.L.O., for appellant.

Jon Bruning, Attorney General, and James D. Smith for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

MCCORMACK, J.

## I. NATURE OF CASE

After trial to a jury, Elmore Hudson, Jr., was convicted of first degree murder, attempted second degree murder, and two counts of use of a deadly weapon to commit a felony. Hudson was sentenced to life imprisonment for the first degree murder conviction, 30 years' imprisonment for the attempted second degree murder conviction, and 20 years' imprisonment for each of the two use of a deadly weapon to commit a felony convictions, the sentences to be served consecutively. Hudson appeals, claiming errors in the trial court's communication with the jury after deliberations had begun, the State's failure to prove proximate cause, and the admission of expert testimony regarding certain matters related to the deceased victim's treatment and prognosis.

## II. BACKGROUND

On January 29, 2001, Hudson and Derreck Jones broke into the apartment of Victor Rodriguez and his girl friend, Margarite Salgado, located in Omaha, Nebraska, with the intent to steal money and drugs. Jones testified that upon kicking down the door to the apartment, Hudson began repeatedly striking Rodriguez in the back of the head with a wooden softball bat he had brought with him. After punching Salgado in the face several times, Jones began searching the apartment for money and marijuana while Hudson began hitting Salgado with the bat. When Hudson and Jones left the apartment, Rodriguez and Salgado were apparently unconscious. Testimony adduced at trial indicates that on January 31, Salgado apparently regained consciousness and was able to go

for help. Both Salgado and Rodriguez were taken by ambulance to St. Joseph Hospital. Rodriguez was transported to the hospital as a "Code 3," which meant he had life-threatening injuries and was determined to be near death.

Because Hudson argues that his assault upon Rodriguez did not cause Rodriguez' death, we will set out in detail the medical treatment rendered to Rodriguez. Upon admittance to St. Joseph Hospital, Rodriguez was diagnosed as having sustained a severe traumatic brain injury and was in a coma. Rodriguez sustained a large laceration to the left frontal part of his scalp, exposing the bone; a laceration just to the right top of his scalp; and a large entry to the back of his head. Rodriguez also sustained multiple fractures to the back section of his skull. Upon admission to St. Joseph Hospital, the record indicates Rodriguez had a 30-percent chance of death and was at risk of developing pneumonia, infection, abnormal bone formation, hydrocephalus (a buildup of pressure in the brain), and seizures. Moreover, due to the extent of Rodriguez' brain injury, Rodriguez was also at risk for impaired swallowing. A swallowing evaluation performed at St. Joseph Hospital showed that Rodriguez was in danger of having whatever he swallowed end up in his lungs, commonly referred to as "gastric aspiration." As a result, a feeding tube was placed through Rodriguez' abdominal wall to assist him with eating.

Dr. Jose Poblador, a licensed rehabilitation physician and director of brain injury rehabilitation at the Madonna Rehabilitation Hospital (Madonna Center) in Lincoln, Nebraska, testified on behalf of the State. Poblador's testimony revealed that he attended Ohio University, College of Osteopathic Medicine, in Athens, Ohio, and has specialized training in treating traumatic brain injuries. Upon Rodriguez' admittance into the Madonna Center on March 27, 2001, Poblador described Rodriguez as restless, incoherent, not able to follow or respond to simple commands, speaking only infrequently, not capable of symmetrical eye movement, unable to walk without substantial assistance, and pulling at his feeding tube even after the Madonna Center staff placed both of Rodriguez' hands in mittens. Rodriguez' condition while at the Madonna Center required that he receive constant, 24-hour-per-day, one-on-one care by nursing staff to prevent him from crawling out of bed or pulling on his feeding tube.

As a result of these apparent difficulties, Poblador ordered that nurses check Rodriguez' vital signs, blood pressure, and temperature at least every 8 hours. Poblador also followed up on orders from Rodriguez' gastroenterologist at St. Joseph Hospital that Rodriguez receive a new feeding tube. Poblador testified that replacement of the old feeding tube with a new one in a different location became necessary when the Madonna Center personnel began experiencing difficulty feeding Rodriguez and giving him fluids and medication through the original tube. The gastroenterologist discovered that the feeding tube was pulled from its hole through the abdominal wall. On April 12, 2001, the old feeding tube was pulled and a new tube placed in a different location. At that time, the gastroenterologist reinitiated the tube feeding at its previous rate of 95 cc per hour and water at 250 cc four times per day. At that time, Rodriguez was also placed on medication to improve the movement of residuals of the tube feeding from Rodriguez' stomach into the small intestine.

After the feeding tube was replaced, Madonna Center medical staff regularly checked the residuals of the tube feeding in Rodriguez' stomach at designated times. Within a few days after the tube replacement, the Madonna Center nurses reported that Rodriguez was not tolerating the tube feeding. As a result, the Madonna Center physician assigned to Rodriguez at the time decreased the feeding rate to 50 cc, and then to 30 cc on April 14, 2001. Poblador testified that Rodriguez' demonstrated intolerance to tube feeding is a common complication of a traumatic brain injury. On April 17, the gastroenterologist gave an order to change the tube feeding from a continuous delivery to a bullous delivery, which, for Rodriguez, meant 250 cc delivered into the tube five times daily. Poblador testified that the primary reason for changing from continuous to bullous tube feeding is typically to allow the patient more mobility. However, Poblador testified that in Rodriguez' case,

> the more important reason for him [to change to bullous tube feeding] is that he is agitated, restless and has shown previously a tendency to pull tubes, catheters. So, this having been the second tube already, [the gastroenterologist] could have been trying to provide more protection to the patient so that he doesn't pull the tube again.

On that same date, the gastroenterologist ordered that he be notified if Rodriguez' residuals exceeded 150 cc and that the residuals plus tube feeding should equal 250 cc with each bullous feeding.

On April 19, 2001, shortly after 3 p.m., medical records indicate that Rodriguez vomited. At approximately 6 p.m. that same day, Rodriguez' medical records indicate that his residuals measured at 190 cc and that his bullous feeding was withheld. At 9:45 p.m., Rodriguez' residuals were approximately 200 cc and the Madonna Center nursing staff again withheld Rodriguez' bullous feeding. At midnight, Rodriguez' residuals measured at 240 cc. Shortly thereafter, Rodriguez vomited again and became unconscious. The Madonna Center personnel immediately began administering emergency assistance to Rodriguez, and he was subsequently taken to BryanLGH Medical Center, where he died. Poblador agreed that the Madonna Center nurses' records did not reflect whether the gastroenterologist was contacted at the time Rodriguez' residuals moved above 150 cc; Poblador testified, however, that Rodriguez' residuals plus bullous feeding levels never exceeded 250 cc.

Poblador further testified, over objection, that Rodriguez' severe traumatic brain injury put him at high risk for gastric aspiration. Poblador concluded that the cause of Rodriguez' death was gastric aspiration, secondary to severe traumatic brain injury.

Dr. Robert E. Bowen, a pathologist who conducted an autopsy of Rodriguez, also testified on behalf of the State. Bowen testified that Rodriguez' head injuries were consistent with being hit by a bat. Bowen also testified that other than the injuries to his head and a mild case of emphysema, Rodriguez was a fairly healthy individual. With respect to the cause of Rodriguez' death, Bowen's autopsy report states that "[t]he immediate cause of death of this individual is attributed to gastric aspiration with extensive bronchopneumonia. The proximate cause of death is attributed to blunt trauma to the head." At trial, Bowen confirmed the autopsy report, testifying to a reasonable degree of medical certainty that

> the immediate cause of death . . . was gastric aspiration. That is, food was removed — it was aspirated from his stomach into his lungs which triggered him to die. And this

is a result of head injury, of blunt head injury, severe head injury, which made it so he wasn't able to swallow and protect his airway.

At the close of the State's case and again at the close of Hudson's case, Hudson moved to dismiss the charges against him, contending the State had failed to prove a prima facie case. Specifically, Hudson contended that the State failed to prove Hudson's assault was the proximate cause of Rodriguez' death. The trial court overruled both motions.

The jury convicted Hudson on all counts, and the trial court entered its order on the jury's verdict. Hudson subsequently filed a motion for new trial, alleging irregularities in the proceedings of the court and witnesses, that the verdict was not sustained by sufficient evidence and was contrary to law, and that several errors of law occurred at trial to which Hudson objected. In the motion for new trial, Hudson also raised all other motions and objections previously raised before the court. The trial court denied Hudson's motion for new trial, and Hudson appeals to this court.

### III. ASSIGNMENTS OF ERROR

Hudson assigns, restated, that the trial court committed reversible error when it (1) denied Hudson's motion for new trial despite the court's improper directive to the jury after it retired to deliberate regarding the length of time required for jury deliberations; (2) denied Hudson's motion to dismiss at the end of the case for the reason that the State failed to prove, as a matter of law, that Hudson proximately caused the death of Rodriguez; and (3) allowed Poblador, Rodriguez' attending physician, to speculate regarding certain matters concerning Rodriguez' treatment and prognosis. Specifically, Hudson advances three separate contentions with respect to his third assignment of error. Hudson first contends that Poblador is a doctor of osteopathy, not a doctor of medicine or a surgeon, and therefore could only speculate regarding how Rodriguez' skull reformation procedure was performed. Second, Hudson contends that Poblador's testimony regarding Rodriguez' poor prognosis for recovery and ability to live on his own was complete conjecture. Third, Hudson contends Poblador was not qualified

to testify that Rodriguez was at a greater risk for gastric aspiration due to the severe traumatic brain injury he sustained and that Poblador failed to testify to the same to a reasonable degree of medical or osteopathic certainty.

## IV. STANDARD OF REVIEW

■ When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Leonor*, 263 Neb. 86, 638 N.W.2d 798 (2002).

■ In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003); *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002).

■ A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Kvamme v. State Farm Mut. Auto. Ins. Co.*, 267 Neb. 703, 677 N.W.2d 122 (2004).

## V. ANALYSIS

### 1. JUDICIAL MISCONDUCT

■ Hudson first contends that the trial court should have granted his motion for new trial due to alleged irregularity occurring during jury deliberations. Neb. Rev. Stat. § 29-2101 (Cum. Supp. 2002) provides:

> A new trial, after a verdict of conviction, may be granted, on the application of the defendant, for any of the following grounds affecting materially his or her substantial rights: (1) Irregularity in the proceedings of the court, of the prosecuting attorney, or of the witnesses for the state or in any order of the court or abuse of discretion by which the defendant was prevented from having a fair trial . . . .

Moreover, in order for a new trial to be granted, it must be shown that a substantial right of the defendant was adversely affected and that the defendant was prejudiced thereby. *State v. Mahlin*, 236 Neb. 818, 464 N.W.2d 312 (1991).

Hudson contends that the trial court violated Neb. Rev. Stat. §§ 25-1115 and 25-1116 (Reissue 1995) when it communicated with the jury, albeit through its bailiff, after the jury retired to deliberate.

Section 25-1115 provides:

No oral explanation of any instruction authorized by the preceding sections shall, in any case, be allowed, and any instruction or charge, or any portion of a charge or instructions, given to the jury by the court and not reduced to writing, as aforesaid, or a neglect or refusal on the part of the court to perform any duty enjoined by the preceding sections, shall be error in the trial of the case, and sufficient cause for the reversal of the judgment rendered therein.

Section 25-1116 provides:

After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony, or if they desire to be informed as to any part of the law arising in the case, they may request the officer to conduct them to the court where the information upon the point of law shall be given, and the court may give its recollection as to the testimony on the point in dispute in the presence of or after notice to the parties or their counsel.

Hudson contends that after 1 day of deliberations, one juror inquired of the court's bailiff regarding how long the jury would have to deliberate. The record on appeal indicates that prior to the jury rendering its verdict, counsel for Hudson inquired of the court regarding this communication as follows:

[Hudson's counsel]: And the only other thing was, apparently, someone in passing suggested to your bailiff or inquired as to how long they had to deliberate or how long they were supposed to deliberate, and at some point the bailiff contacted the Court and went back and told them basically you deliberate as long as the case lasted; is that my understanding?

THE COURT: Well, what happened is the first questions that were posed by the jury included a question about what happens if the jury is hung, which I told you my comment was, I can't comment on that. When that question was delivered to my bailiff, they wondered how long if they were — they would have to deliberate if they couldn't reach a verdict, and I just told her that a rule of thumb is generally at least the length of time of the trial, but that's not necessarily the hard and fast rule. So that's what that is about.

[Hudson's counsel]: And I don't think that question was in writing, and that's the only reason I wanted to — that's all I wanted to make a record of. That's it.

THE COURT: No, it wasn't. So that did occur.

At no time before the verdict was rendered did Hudson move for a mistrial. When a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial. One may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error. *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994). Accordingly, this assignment of error is without merit.

## 2. PROXIMATE CAUSE

Hudson next contends that the State failed to prove that severe head trauma proximately caused Rodriguez' death. On appellate review, a criminal conviction must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Leonor*, 263 Neb. 86, 638 N.W.2d 798 (2002). When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* Moreover, in determining whether the evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, evaluate explanations, or reweigh the evidence presented to the jury, which are

within the jury's province for disposition. *Id.*; *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003).

In *State v. Harris*, 194 Neb. 74, 80, 230 N.W.2d 203, 207 (1975), we enunciated the following general rule:

> "The act of accused must be a proximate cause of death but need not be the direct, immediate cause. It is sufficient if the direct cause resulted naturally from the act of accused, as where the direct cause was a disease or infection resulting from the injury inflicted by accused. . . . It is not a defense to one whose act has contributed to the death that improper treatment on the part of physicians, nurses, or the victim also contributed thereto; but one who has inflicted an injury is not responsible for homicide where death results solely from erroneous treatment by another."

See, also, *State v. Meints*, 212 Neb. 410, 322 N.W.2d 809 (1982) (reaffirming this principle). Proximate cause of death is " 'that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the death, and without which the result would not have occurred. It is the efficient cause, the one that necessarily sets in operation the factors that accomplish the death.' " *State v. Lytle*, 194 Neb. 353, 358, 231 N.W.2d 681, 685 (1975). An efficient intervening cause is a new and independent cause, itself a proximate cause of a death, which breaks the causal connection between the original illegal act and the death. *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002).

Hudson contends that because Rodriguez' health was steadily improving, the Madonna Center medical staff, and not the brain injury, was the proximate cause of Rodriguez' death. Even if an improving condition were a dispositive factor, which it is not, the record does not support Hudson's contention that Rodriguez' condition had more than marginally improved, if at all. Poblador testified that while Rodriguez was speaking more intelligibly and seemed a little more alert toward the latter part of his stay at the Madonna Center, his condition in mid-April 2001 generally was not very different from what it was upon admittance to the Madonna Center on March 27. Hudson's expert, Dr. Gerald Langdon, a doctor specializing in internal medicine, testified that

[d]uring the approximate three weeks [Rodriguez] was [at the Madonna Center], the staff made an excellent attempt at trying to begin some rehabilitation, without great success, but he was able to walk some, never had any meaningful ability to communicate and had a great deal of difficulty cooperating. And also didn't seem to recognize people around him and such. Although, there were rare instances when he seemed to make some sense.

Hudson further contends that the evidence clearly shows that had the Madonna Center staff followed the gastroenterologist's orders and properly notified him when Rodriguez' residuals reached 150 cc, Rodriguez would not have died. Hudson maintains that Rodriguez' level of improvement combined with Langdon's testimony that people who have feeding tubes can live for extended periods of time, breaks the causal chain. Hudson provides no citations to the record in support of his contention. Indeed, our review of the record points to a contrary conclusion.

None of the experts were expressly asked, and none testified, regarding the issue of whether Rodriguez would still be alive but for the alleged failure to contact the gastroenterologist when Rodriguez' residuals exceeded 150 cc. To the contrary, witness testimony indicates that Rodriguez was transported to St. Joseph Hospital as a "Code 3" with life-threatening injuries and was near death. Upon admittance to the hospital, Rodriguez had a 30-percent chance of death and was at risk of pneumonia, seizures, and impaired swallowing as a result of the head injury. A swallowing evaluation performed at the hospital confirmed impairment and that Rodriguez was at risk for gastric aspiration. Poblador's and Langdon's testimony confirmed that Rodriguez' condition put him at high risk for gastric aspiration.

Poblador concluded that the cause of Rodriguez' death was gastric aspiration, secondary to severe traumatic brain injury. While Hudson objected to Poblador's testimony on the ground that it was complete conjecture, as discussed later in this opinion, we find this objection to be unfounded. In addition, Bowen's autopsy report states that "[t]he proximate cause of death is attributed to blunt trauma to the head." At trial, Bowen confirmed the autopsy report, testifying to a reasonable degree of medical certainty that

the immediate cause of death . . . was gastric aspiration. That is, food was removed — it was aspirated from his stomach into his lungs which triggered him to die. And this is a result of head injury, of blunt head injury, severe head injury, which made it so he wasn't able to swallow and protect his airway.

The only testimony in the record that in any way relates to Hudson's contention that the Madonna Center medical personnel were negligent comes from Hudson's expert, Langdon. Langdon testified on direct examination that the blunt head trauma is not what caused Rodriguez to die. Langdon explained that Rodriguez sustained the head injuries approximately 70 days prior to his death but died within a period of 10 minutes and that he died "of an acute — I don't want to really say failure of nursing care or anything like that, because I'm not going to cast stones at this facility. It's a very difficult job to care for a patient like this, but the fact is that he did have excessive feeding." However, Langdon further testified on direct examination that it was his opinion that Rodriguez' head injury was a secondary cause of death. Langdon testified as follows:

Q. Do you have an opinion, Dr. Langdon, to a reasonable degree of medical certainty as to why or how Victor Rodriguez died in this case?

A. Well —

Q. Just yes or no.

A. Yes, I do.

Q. Can you tell me what that opinion is?

A. The easiest way would be for me to describe how I would sign his death certificate. And, incidentally, I don't think we've yet seen a death certificate, if I may say that.

Q. Okay.

A. I would sign his death certificate in this manner: No. 1 is acute unexpected cardiopulmonary arrest, secondary to acute gastric aspiration, secondary to gastric retention of feeding material. And then we add after those acute episodes the longer things, the more persistent things and those would be persistent invalidism, secondary to blunt head trauma. In other words, it's self-evident that something caused him to be in this condition.

On cross-examination, Langdon again admitted a causal relationship between Rodriguez' death and the blunt head trauma. Langdon testified as follows:

Q. If you would have signed this death certificate, you would have included secondary to blunt trauma to the head, correct?

A. That would be the remote reason why he was even there, of course.

Q. Wouldn't be having a [feeding] tube if it hadn't been for the blunt trauma to the head?

A. I think that everyone could understand that.

Q. He wouldn't have aspirated had he not had a head injury, correct?

A. That's a different question, completely. He wouldn't have been there if he had not had the injury. The injury was not necessarily the reason for the aspiration. Those are two separate events.

Q. Okay. The reason for the [feeding] tube is the head injury?

A. No, the reason for the [feeding] tube is nutrition.

Q. Because he can't do it on his own?

A. Fine.

Q. Correct?

THE COURT: Yes or no?

THE WITNESS: Yes.

Q. . . . So you're not here telling the ladies and gentlemen of this jury that his cause of death had nothing to do with the blunt trauma to his head, are you?

A. Not at all.

Hudson further contends that because Bowen testified that the necessity of feeding tubes is not exclusive to patients with blunt head trauma, that fact alone requires a finding that death resulting from complications associated with feeding tubes constitutes a supervening cause. Hudson appears to advance this conclusion notwithstanding the existence of a causal relationship between the event initially necessitating the feeding tube and the subsequent death. Our research reveals several factually similar cases that reach a contrary conclusion.

For example, in *State v. Baker*, 87 Or. App. 285, 742 P.2d 633 (1987), following a motorcycle accident, the victim was in a comatose state and had a tracheostomy tube in her throat for breathing. Two months after the accident, the victim was transferred from the hospital to a nursing home. Eight days after moving to the nursing home, medical personnel removed the victim's tracheostomy tube, and the next day she died. The court determined that "one who criminally inflicts an injury upon another is responsible for that other's death, notwithstanding later negligent medical treatment, unless the medical treatment was so grossly erroneous as to have been the sole cause of death." *Id*. at 289, 742 P.2d at 635-36. The court stated that when viewed most favorably to the defendant, the evidence showed that removal of the tube, negligently or otherwise, did not cause the victim's inability to breathe, the consequences of the head injury did. *Id*. As such, the court found the defendant criminally responsible for the victim's death. See, also, *Brackett v. Peters*, 11 F.3d 78 (7th Cir. 1993); *Davis v. State*, 520 N.W.2d 319 (Iowa App. 1994).

Based on our review of the record, we conclude that a reasonable jury could have concluded beyond a reasonable doubt that severe head injury inflicted by Hudson was a proximate cause of Rodriguez' death. Accordingly, Hudson's second assignment of error is without merit.

### 3. Testimony of Poblador

For his third assignment of error, Hudson contends that Poblador was permitted, over objection, to speculate regarding Rodriguez' skull repair surgery, the likelihood of gastric aspiration for an individual in Rodriguez' situation, and the likelihood that Rodriguez would eventually be able to live again on his own.

### (a) Rodriguez' Surgery

Hudson first contends that the trial court erroneously overruled Hudson's foundation objection to Poblador's testimony describing how Rodriguez' skull reformation procedure was performed while Rodriguez was still at St. Joseph Hospital. Hudson contends that Poblador never qualified himself as a surgeon and that the record establishes that Poblador is only a doctor of osteopathy and not necessarily a doctor of medicine. Thus, Hudson contends,

Poblador was not familiar with skull reformation surgery and was to some degree "guessing" when he testified regarding the surgery performed at St. Joseph Hospital to repair Rodriguez' skull. Brief for appellant at 26.

 Under Neb. Evid. R. 703, an expert may rely on hearsay facts or data reasonably relied upon by experts in that field. *State v. Pruett*, 263 Neb. 99, 638 N.W.2d 809 (2002); *State v. Whitlock*, 262 Neb. 615, 634 N.W.2d 480 (2001). See § 27-703. A medical expert may express opinion testimony in medical matters based, in part, on reports of others which are not in evidence but upon which the expert customarily relies in the practice of his or her profession. See, *Vacanti v. Master Electronics Corp.*, 245 Neb. 586, 514 N.W.2d 319 (1994); *Clark v. Clark*, 220 Neb. 771, 371 N.W.2d 749 (1985).

In the instant case, according to Poblador's testimony, he was licensed as a doctor in 1997 and his specialty is in the area of treating brain injuries. He attended the osteopathic school at Ohio University, College of Osteopathic Medicine. Osteopathy is "[a] system of complete medical practice based on the maintenance of proper relationships among the various parts of the body. Osteopathic physicians, licensed in all 50 states, employ manipulative therapy, drugs, surgery, x-ray, and all other accepted therapeutic methods in the treatment of disease and injury." Black's Law Dictionary 1101 (6th ed. 1990). Poblador further testified that he performed his residency in rehabilitation medicine at the hospital of the University of Pennsylvania in Philadelphia, Pennsylvania, and that from 1996 to 1997, he participated in a 1-year brain injury fellowship at Baylor University in Houston, Texas. When asked to describe the brain injury fellowship, Poblador stated:

> In rehabilitation medicine, of course, it's sort of a general field, so we take care of different varieties of patients, including traumatic brain injuries. So I took an additional training just to take care of traumatic brain injured patients. That includes essentially patients who have had car accidents, falls, anything that has trauma to the head.

Poblador has been the director of brain injury rehabilitation and the mild traumatic brain injury clinic at the Madonna Center for 2 years. Before coming to the Madonna Center, Poblador was

the medical director of brain injury rehabilitation at Spalding Hospital in Aurora, Colorado, for 5 years.

Poblador testified that it is his normal procedure to review medical records from previous hospitals so as to gain a better understanding of a patient's case and history to provide the best possible care. Poblador further testified that prior to treating Rodriguez, he reviewed all of the documentation from St. Joseph Hospital. Moreover, on cross-examination, Poblador testified that in preparation for his testimony at trial, he reviewed all of the records generated by the Madonna Center relative to Rodriguez as well as a combination of records from St. Joseph Hospital. These included doctors' reports from their evaluations, procedure notes, *including surgeries*, speech therapy evaluations, progress notes, daily physician notes, CAT scan reports, and laboratory test reports.

The testimony in which Poblador describes the skull repair surgery was clearly taken from his review of St. Joseph Hospital's medical records. Poblador's review of Rodriguez' surgical records and any conclusions he drew from those records are activities that are consistent with his practice in the field of brain injury rehabilitation.

Based on our review of the record, Poblador properly qualified himself as a medical expert in the field of traumatic brain injuries. Moreover, we determine that Poblador reasonably relied upon the reports of medical professionals, including surgical reports of the kind at issue in this case. Poblador's testimony regarding the skull reformation procedure was based upon his review of the medical records from St. Joseph Hospital. As such, we find that the trial court did not abuse its discretion in admitting Poblador's testimony regarding the skull reformation procedure.

### (b) Testimony Regarding Likelihood for Gastric Aspiration

Hudson next contends that the trial court erroneously overruled Hudson's foundation and form objections to Poblador's testimony that it was his opinion that Rodriguez was at greater risk for gastric aspiration due to the severe traumatic brain injury he sustained. Hudson contends Poblador was not qualified to give this testimony and did not do so to a reasonable degree of medical or osteopathic certainty.

The testimony at trial indicates that gastric aspiration is a common condition associated with traumatic brain injury. Moreover, Hudson's own expert, Langdon, conceded on cross-examination that without the severe traumatic head injury, Rodriguez would not have aspirated. Bowen testified, over objection, that has not been assigned as error in this appeal, that the gastric aspiration experienced by Rodriguez was a complication of the traumatic brain injury. Moreover, Poblador testified, without objection, that according to St. Joseph Hospital's medical records, upon admittance to the hospital, a swallowing evaluation was performed that confirmed Rodriguez was at risk for gastric aspiration. As an expert in brain injury rehabilitation, Poblador was familiar with and qualified to testify regarding Rodriguez' risk for gastric aspiration. Accordingly, we determine that it was not an abuse of discretion for the trial court to admit this testimony.

(c) Poblador's Testimony Regarding Rodriguez' Prognosis

Hudson's final contention is that the trial court erred in allowing Poblador to testify, over objection, that Rodriguez had a poor prognosis for a good recovery. Specifically, Hudson contends:

> While, admittedly, Dr. P[o]blador may be familiar with how other patients have responded after having suffered from blunt trauma injury — after all, he is the Director of the Madonna Rehabilitation Hospital — it is complete conjecture as to when, if, and how long Mr. Rodriguez would take in order to attain a certain level of recovery.

Brief for appellant at 27.

An expert must possess facts which enable him or her to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture. *State v. Davlin*, 263 Neb. 283, 639 N.W.2d 631 (2002). Based on Poblador's qualifications enumerated above and the testimony underlying his prognosis for Rodriguez' recovery, we conclude that Poblador was qualified to and possessed sufficient facts to enable him to offer an opinion as to Rodriguez' prognosis for recovery. As such, this assignment of error is without merit.

## VI. CONCLUSION

Because Hudson did not move for a mistrial based upon the alleged improper communication, he cannot now complain of an

unfavorable verdict. When a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial. One may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error. *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994). Regarding his second assignment of error, we conclude that the evidence was sufficient to support Hudson's conviction. Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found that the blunt head injury inflicted by Hudson proximately caused Rodriguez' death. Finally, with respect to Hudson's third assignment of error, we conclude that there was sufficient foundation for Poblador to testify about his review of the medical report regarding the skull reformation procedure. We further conclude that Poblador was qualified to testify regarding Rodriguez' prognosis and risk for gastric aspiration. For the foregoing reasons, the judgment of the trial court is affirmed.

AFFIRMED.