Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/10/2023 09:06 AM CST

State of Nebraska, appellee, v.
Dale Matteson, appellant.
___ N.W.2d ___

Filed February 10, 2023.    No. S-21-484.

1. **Constitutional Law: Statutes: Judgments: Appeal and Error.** The constitutionality and construction of statutes are questions of law, regarding which appellate courts are obligated to reach conclusions independent of those reached by the court below.

2. **Constitutional Law: Criminal Law: Statutes.** The first step in assessing a void-for-vagueness challenge is to identify and interpret the allegedly vague statutory terms. Only once a court determines what a penal statute means can it decide whether the statutory language, correctly interpreted, is so indefinite as to be unconstitutionally vague.

3. **Criminal Law: Convictions: Evidence: Appeal and Error.** When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

4. **Proximate Cause: Proof.** Three basic requirements must be met in establishing proximate cause: (1) that without the misconduct, the injury would not have occurred, commonly known as the "but for" rule; (2) that the injury was the natural and probable result of the misconduct; and (3) that there was no efficient intervening cause.

5. **Criminal Law: Proximate Cause: Words and Phrases.** An efficient intervening cause is a new and independent cause, itself a proximate cause of a death, which breaks the causal connection between the original illegal act and the death.

6. **Jury Instructions.** Whether jury instructions given by a trial court are correct is a question of law.

7. **Judgments: Appeal and Error.** On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below.

8. **Criminal Law: Jury Instructions.** If there is an applicable instruction in the Nebraska Jury Instructions, the court should usually give this instruction to the jury in a criminal case.

9. **Rules of Evidence: Other Acts: Appeal and Error.** Whether evidence is admissible for any proper purpose under the rule governing admissibility of evidence of other crimes, wrongs, or acts rests within the discretion of the trial court, and the trial court's decision is reviewed for abuse of discretion.

10. ____: ____: ____. An appellate court's analysis under Neb. Rev. Stat. § 27-404(2) (Reissue 2016) considers (1) whether the evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith; (2) whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice; and (3) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted.

11. **Trial: Convictions: Evidence.** Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.

12. **Rules of Evidence: Appeal and Error.** An appellate court reviews rulings under the residual hearsay exception for abuse of discretion.

13. **Rules of Evidence: Hearsay: Proof.** Under the plain text of Neb. Rev. Stat. § 27-803(24) (Cum. Supp. 2022), a trial court does not weigh the criteria set forth in the rule as part of some sort of balancing test. Rather, the text provides that a hearsay statement must satisfy each of five statutory requirements before it can be admitted.

Appeal from the District Court for Madison County: Mark A. Johnson, Judge. Affirmed.

Michael J. Wilson, of Berry Law Firm, for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

The State charged Dale Matteson with attempted incest and intentional child abuse resulting in death, in violation of Neb. Rev. Stat. § 28-707(1)(a) and (8) (Reissue 2016). The theory of the State's case was that Matteson sexually propositioned his daughter, Z.M., which traumatized Z.M. and prompted her to commit suicide. Matteson entered a guilty plea to the attempted incest charge, and a jury found him guilty of intentional child abuse resulting in death. Matteson appeals the intentional child abuse resulting in death conviction. He argues that § 28-707(1)(a) and (8) are unconstitutionally vague as applied in this case, that the evidence was insufficient to sustain a conviction, and that the district court committed several reversible evidentiary errors. We affirm.

## I. BACKGROUND

### 1. Initial Sexual Abuse and Attempted Suicide

In October 2013, Matteson moved out of the home in which he had been living with his then-wife and their biological daughter, Z.M. Approximately a year later, Z.M. expressed an interest in having a relationship with Matteson and began to visit him at his house. After one such visit in September 2015, when Z.M. was 12 or 13 years old, Z.M. returned to her mother's house crying. She reported that Matteson was molesting her. Z.M.'s mother sought medical attention.

Z.M. was thereafter interviewed in the child advocacy center of a hospital, a unit designed to help children who have been exposed to traumatic abuse. During that forensic interview, Z.M. described how Matteson would rub her bare chest and put his hands inside her pants when they were alone together. Z.M. also described waking up with a sore vaginal area on occasion. Z.M. reported that the assaults occurred "numerous times" in the previous year—"possibly 40 to 50 times."

Z.M. subsequently underwent counseling and again reported that she was sexually abused by Matteson during visitation.

Z.M. remained in counseling until approximately November 2016. Z.M.'s counselor instructed her mother to keep her away from Matteson.

Despite the instructions of Z.M.'s counselor, Z.M.'s mother allowed Z.M. to see Matteson in December 2016. Matteson had asked to give Christmas presents to Z.M., her mother, and her sister. Z.M.'s mother met Matteson to receive the presents; Z.M. was in the passenger seat of her mother's car. After briefly seeing Matteson during that exchange, Z.M. became depressed and started having "nightmares of being raped."

In February 2017, Z.M. attempted suicide by taking "a couple handfuls" of her mother's prescription steroid pills. She was rushed to an emergency room, where she reported that she took her mother's medication because "her father sexually abused her and she was trying to commit suicide."

Z.M.'s mother informed Matteson of Z.M.'s suicide attempt and hospitalization at that time. She also relayed to Matteson that Z.M. reported being depressed and attempting suicide "because of the sexual abuse that he had done to her."

## 2. July 17, 2019, Incident

In 2019, Z.M., then 17 years old, expressed a desire to her mother to reunify with Matteson. Z.M.'s mother allowed a reunification to occur.

On July 17, 2019, Matteson approached Z.M. in his apartment completely naked and propositioned her. Matteson told Z.M. that "one night God told him that it was okay for them to have a relationship," that she was "ready" because she touched his penis when she was a "little girl," and that he "could teach her things that guys her age couldn't." Matteson also said that "sex shouldn't be difficult, and that if you have any urges to have sex with somebody, you shouldn't stop those urges." Z.M. went to her bedroom, locked the door, and cried.

Z.M. later reported these details to her mother. Her mother contacted law enforcement, and Matteson was arrested the next day.

### 3. Z.M.'s Death

Z.M.'s mental and physical health declined following the July 17, 2019, incident. She rarely slept and had nightmares when she did. She felt anxious, rarely ate, and devoted little attention to her appearance.

On September 5, 2019, Z.M. reported suicidal thoughts to her mother. Her mother took her to a medical clinic. At the clinic, Z.M. reported that she was having suicidal thoughts and that she could not get the image of her naked father out of her head. At the recommendation of the medical provider at the clinic, Z.M.'s mother then took her to the emergency room. When asked by the emergency room physician about why she wanted to commit suicide, Z.M. identified several causes of stress, but reported that "the most predominant one was the attempted incestuous relationship recently that had happened between her and her biological father." The emergency room physician described Z.M. at that time as "very depressed" and unable to "think about much else." Z.M. was referred to another hospital, where she remained until she was discharged on September 9.

On the morning of September 18, 2019, Z.M. purchased pills from a discount store. She was found deceased in a locked car on September 20. Two bottles of generic Benadryl, a handwritten journal, and suicide notes were found inside the car. Poisoning from Benadryl was determined to be the cause of death.

### 4. Procedural History

The State charged Matteson with attempted incest and intentional child abuse resulting in death. Matteson entered a plea of guilty to attempted incest. During the plea hearing, Matteson made the following statement.

> On or about July 17th of 2019, I had a conversation with my daughter, [Z.M.], and made ill-advised comments or statements in [an] attempt to commit incest, and from

that point on, I think I can't tell you enough how deeply
remorseful and regrettable that was for me and for her.

The district court accepted Matteson's guilty plea to the
attempted incest charge.

A trial was held on the intentional child abuse resulting
in death charge. The witnesses called by the State included
Z.M.'s mother and various medical professionals who treated
and counseled Z.M. The State also called Matteson's niece,
who testified that Matteson had groped her, and a friend of
Matteson's niece, who testified that Matteson's niece reported
the abuse to her. The State also offered, and the district court
received, a video recording of the 2015 forensic interview of
Z.M. Just prior to the close of the State's evidence, the State
read the statement Matteson made at his plea hearing to the
jury. Matteson offered the handwritten journal found in Z.M.'s
car, but the district court excluded it from evidence. Additional
details regarding the evidence introduced at trial are discussed
as necessary in the analysis section below.

The jury convicted Matteson of intentional child abuse
resulting in death. The district court sentenced him to 75 to 80
years' imprisonment on the intentional child abuse resulting
in death conviction and to 2 to 3 years' imprisonment on the
attempted incest conviction.

Matteson timely appealed. We granted his petition to bypass
the Nebraska Court of Appeals.

## II. ASSIGNMENTS OF ERROR

Matteson assigns eight errors: (1) that the statute prohibiting
intentional child abuse resulting in death is unconstitutionally
vague as applied to his conduct, (2) that the evidence was
insufficient to sustain a conviction for intentional child abuse
resulting in death, (3) that the district court erred in declining
to instruct the jury that an efficient intervening cause breaks
the chain of proximate causation, (4) that the district court
erred in admitting the testimony of Matteson's niece, (5) that
the district court plainly erred by failing to give a limiting

instruction following the testimony of Matteson's niece, (6) that the district court erred in admitting the testimony of Matteson's niece's friend, (7) that the district court erred in admitting the video recording of the 2015 forensic interview, and (8) that the district court erred in excluding the handwritten journal from evidence.

## III. ANALYSIS

### 1. Void-for-Vagueness Challenge

#### (a) Standard of Review

[1] The constitutionality and construction of statutes are questions of law, regarding which appellate courts are obligated to reach conclusions independent of those reached by the court below. *State v. Montoya*, 304 Neb. 96, 933 N.W.2d 558 (2019).

#### (b) Analysis

Matteson first argues that § 28-707(1)(a) and (8) are void for vagueness as applied to his conduct. The Nebraska and federal Constitutions both guarantee that "[n]o person shall be deprived of life, liberty, or property, without due process of law . . . ." Neb. Const. art. I, § 3. See U.S. Const. amend. XIV, § 1. The government violates due process when it takes away someone's liberty "under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015). See *Montoya, supra*.

[2] The first step in assessing a void-for-vagueness challenge is to identify and interpret the allegedly vague statutory terms. See *Johnson, supra*. Only once a court determines what a penal statute means can it decide whether the statutory language, correctly interpreted, is so indefinite as to be unconstitutionally vague. See *State v. Irons*, 254 Neb. 18, 574 N.W.2d 144 (1998). As one federal court of appeals summarized, "[F]irst, we must construe the meaning of the

term . . . . Second, we must determine whether the [statute] is void for vagueness under the construction we have adopted." *U.S. v. Lachman*, 387 F.3d 42, 50 (1st Cir. 2004). See, also, *U.S. v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) ("a statute's vagueness is either susceptible to judicial construction or is void for vagueness based on the application of traditional rules for statutory interpretation").

The statute challenged here provides that a "person commits child abuse if he or she knowingly, intentionally, or negligently causes or permits a minor child to be . . . [p]laced in a situation that endangers his or her life or physical or mental health." § 28-707(1)(a). The offense is a Class IB felony if it is "committed knowingly and intentionally and results in the death of such child." § 28-707(8). Matteson contends that the phrase "results in the death of such child" is unconstitutionally vague.

But, in fact, there is little mystery as to what "results in the death of such child" means, for purposes of § 28-707(8). In *State v. Muro*, 269 Neb. 703, 695 N.W.2d 425 (2005), we held that "results in the death of such child" required the government to prove that the defendant's abuse proximately caused the abused child's death. *Muro* thus not only interpreted the language Matteson claims is unconstitutionally vague, it interpreted that language to require the State to establish a very familiar legal standard with an extensive common-law heritage: proximate cause. Indeed, Matteson himself does not appear to truly question what "results in the death of such child" means: his brief cites *Muro* and goes on to argue at some length that the State failed to introduce sufficient evidence that Matteson's abuse proximately caused Z.M.'s death.

The fact that we have interpreted the "results in the death of such child" language in § 28-707(8) to require that the State prove that the abuse proximately caused the death of the child makes Matteson's vagueness challenge difficult. After all, the void-for-vagueness doctrine protects against laws that force "men of common intelligence [to] guess at [their]

meaning." *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926). But there is little room for guesswork if the language of the law in question has "a well-settled common law meaning, notwithstanding an element of degree in the definition as to which estimates might differ." *Id.*

Matteson nonetheless insists that "[b]ecause there is no [l]egislative or judicial guidance as to what circumstances result in a child abuse victim's suicide," persons in his position are forced to guess whether such a death will be considered to result from child abuse for purposes of § 28-707(8). Brief for appellant at 24. But this is simply not so. Under the statute and our interpretation in *Muro*, a suicide, like any other death, "results" from intentional child abuse if it is proximately caused by such abuse. The concept of proximate cause is further defined by our many cases discussing and applying that common-law concept. See, e.g., *State v. Irish*, 292 Neb. 513, 873 N.W.2d 161 (2016); *Muro, supra*.

To be sure, proximate cause is a qualitative standard rather than a bright-line rule—but that alone does not render the statute so indefinite as to be unconstitutional. A law is not void for vagueness merely because it "requires a person to conform his conduct to an imprecise but comprehensible normative standard." *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S. Ct. 1686, 29 L. Ed. 2d 214 (1971). Rather, a statute offends due process only if "no standard of conduct is specified at all." *Id.* See, also, *Johnson v. United States*, 576 U.S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015). Here, there is no real dispute about what "results in the death of such child" *means*; it embodies the concept of proximate cause. The more difficult question is instead whether proximate cause was present in this case. But the fact that is a more difficult question does not render the statute vague. As the U.S. Supreme Court explained in *United States v. Williams*, 553 U.S. 285, 306, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008), "[w]hat renders a statute vague is not the possibility that it will sometimes

be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."

Matteson also argues that the statute fails the second prong of the void-for-vagueness test because it does not provide "'minimal guidelines to govern law enforcement.'" Brief for appellant at 24, quoting *Smith v. Goguen*, 415 U.S. 566, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974). This argument, however, encounters essentially the same difficulties we have already discussed. In the cases Matteson relies on in support of this argument, the statutes at issue were found unconstitutionally vague because they used phrases that lacked any well-understood meaning and thus permitted "policemen, prosecutors, and juries to pursue their personal predilections." *Goguen*, 415 U.S. at 575. These statutes criminalized actions such as treating the American flag "contemptuously," *id.* (internal quotation marks omitted); failing to provide "credible and reliable" identification to a peace officer, *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983) (internal quotation marks omitted); and "loitering [among] criminal street gang members," *Chicago v. Morales*, 527 U.S. 41, 46-47, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) (internal quotation marks omitted).

But that same concern is not present here. Unlike the cases discussed above, police officers, prosecutors, and juries are not free to arrest, charge, or convict someone of intentional child abuse resulting in death unconstrained by any meaningful standards. As we have discussed, the statute applies only if the intentional child abuse proximately causes the child's death.

Whether viewed through the lens of adequate notice or the risk of arbitrary enforcement, Matteson's void-for-vagueness argument is not actually premised on any contention that the meaning of the statute's text is vague. His argument instead rests on his assertion that it is unclear whether the facts of this case are covered by the well-defined legal concept of

proximate cause expressed in the statute or, in other words, that this is a factually close case. The U.S. Supreme Court has instructed, however, that the possibility or existence of a factually close case does not render a statute vague. See *Williams, supra*. The existence of close cases, the Court has explained, is "addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *Id.*, 553 U.S. at 306. At this point, we thus conclude that Matteson's void-for-vagueness assignment of error lacks merit and turn to his argument that there was insufficient evidence to prove beyond a reasonable doubt that his intentional child abuse proximately caused Z.M.'s death.

## 2. Sufficiency of Evidence

### (a) Standard of Review

[3] When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pauly*, 311 Neb. 418, 972 N.W.2d 907 (2022).

### (b) Analysis

As we have discussed, in order to convict Matteson of intentional child abuse resulting in death, the State was required to prove that Matteson's act of intentional child abuse proximately caused Z.M.'s death. Although Matteson does not challenge the evidence that he committed intentional child abuse, he contends that the State failed to introduce sufficient evidence that his intentional child abuse of Z.M. proximately caused her death. We disagree. Viewing the evidence in the light most favorable to the jury's verdict, as our standard of review requires, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Matteson proximately caused Z.M.'s death.

[4] The concept of proximate cause is applicable in both criminal and tort law, and the analysis is parallel in many instances. *State v. Irish*, 292 Neb. 513, 873 N.W.2d 161 (2016). Three basic requirements must be met in establishing proximate cause: (1) that without the misconduct, the injury would not have occurred, commonly known as the "but for" rule; (2) that the injury was the natural and probable result of the misconduct; and (3) that there was no efficient intervening cause. *Id.* Accordingly, to prove that Matteson proximately caused Z.M.'s death by suicide, the State had to prove the following: (1) that but for Matteson's act of child abuse, Z.M. would not have committed suicide; (2) that Z.M.'s death was a natural and probable result of the attempted incest; and (3) that there was no efficient intervening cause. In his brief, Matteson primarily contends that a rational finder of fact could conclude only that Z.M.'s act of suicide was an efficient intervening cause. In addition, at oral argument, he briefly claimed that there was insufficient evidence that Matteson's abuse was a "but for" cause of Z.M.'s death.

We begin by addressing Matteson's suggestion that the State failed to introduce adequate evidence of "but for" causation. To resolve this issue, we must ask whether a rational trier of fact could conclude that Z.M. would not have committed suicide if not for Matteson's act of abuse. We conclude that a rational jury could. Z.M.'s mother testified that Z.M.'s physical and mental health deteriorated following Matteson's propositioning of Z.M. In addition, Z.M.'s mother also testified that on September 5, 2019, when medical attention was sought for Z.M., Z.M. told medical professionals that she was having suicidal thoughts, that she could not get the image of Matteson's naked body out of her head, and that she wanted to commit suicide because of what Matteson had done to her on July 17. An emergency room physician corroborated this account, testifying that Z.M. attributed her desire to commit suicide to "several stressors," but that the "most predominant one" was Matteson's recent suggestion of an

incestuous relationship. Evidence that Z.M. experienced a mental health decline following Matteson's propositioning her and that just weeks before committing suicide she explicitly tied her desire to do so to Matteson's abuse is sufficient to allow a rational jury to conclude that, if not for Matteson's abuse, Z.M. would not have committed suicide.

We are not dissuaded from this conclusion by evidence that Z.M. was suffering from other "stressors" in the time leading up to her death. Even assuming that factors other than Matteson's abuse contributed to Z.M.'s decision to commit suicide, it does not follow that his abuse was not a "but for" cause of her death. Other factors may have combined with Matteson's misconduct to cause Z.M. to commit suicide, but so long as a "reasonable trier of fact could conclude that the other factors alone would not have done so," there is sufficient evidence of "but for" causation. See *Irish*, 292 Neb. at 522, 873 N.W.2d at 168. Based on the evidence discussed above, the jury could have reasonably concluded as much here.

[5] Matteson's more developed argument is focused on efficient intervening cause. He argues that the evidence conclusively demonstrated that Z.M.'s act of committing suicide was an efficient intervening cause and that therefore, Matteson's abuse did not proximately cause her death. An efficient intervening cause is a new and independent cause, itself a proximate cause of a death, which breaks the causal connection between the original illegal act and the death. *State v. Hudson*, 268 Neb. 151, 680 N.W.2d 603 (2004). An intervening cause supersedes and cuts off the causal link only when the intervening cause is not foreseeable. *State v. Irish*, 292 Neb. 513, 873 N.W.2d 161 (2016).

Recognizing the need to demonstrate that Z.M.'s suicide was not foreseeable, Matteson turns to testimony from several witnesses called by the State. He acknowledges that several such witnesses testified that victims of sexual abuse like Z.M. face a higher risk of suicidal ideation, but he contends that no evidence demonstrated a relationship between sexual

abuse and completed suicides. In addition, he points to testimony from Melissa Armstrong, a mental health therapist who treated Z.M., and Ben McBride, a police detective who investigated the case. Armstrong testified that suicidal ideation is very common among females who are sexually assaulted by a family member, but that she had not experienced a high correlation between such abuse and completed suicides. McBride estimated that he had investigated over 1,000 cases of child abuse but testified that this was the only case he was aware of in which a victim of child abuse committed suicide. The only reasonable conclusion that can be drawn from this evidence, Matteson contends, is that it was not reasonably foreseeable that Matteson's propositioning Z.M. would lead Z.M. to take her own life approximately 2 months later. As we will explain below, however, Matteson's argument overlooks evidence in the record that we cannot ignore.

First, Matteson fails to note that there was some evidence in the record of a link between the type of abuse Z.M. suffered and not just suicidal ideation, but suicidal behavior. A mental health nurse practitioner who had previously treated Z.M. testified that in her experience, multiple traumatic childhood experiences "greatly increase[]" a victim's "risk of suicide," and that for "a lot" of adolescent females, sexual trauma can "result[] in acute suicidal behavior." Second, and perhaps more importantly, Matteson also fails to account for Matteson's earlier acts of abuse, Z.M.'s response to those acts, and Matteson's knowledge thereof. As set forth above, the State introduced evidence that Z.M. first attempted suicide in February 2017 and that she then attributed her desire to do so to Matteson's previous sexual abuse. Moreover, Z.M.'s mother testified that she told Matteson that Z.M. had attempted suicide because of the depression caused by Matteson's acts of sexual abuse.

Considering this evidence along with the rest of the record, we cannot say that no rational jury could have found that the State proved that Matteson proximately caused Z.M.'s

death beyond a reasonable doubt. Viewing the evidence, as we must, in the light most favorable to the prosecution, a rational trier of fact could have concluded that, despite the testimony of Armstrong and McBride that they had not personally experienced a case in which an abuse victim committed suicide, it was nonetheless reasonably foreseeable that the act of child abuse Matteson committed on July 17, 2019, would lead Z.M. to commit suicide. To the extent that the State's witnesses gave competing accounts of the likelihood that sexual abuse of a minor may lead to a completed suicide, it is especially within the province of the jury to resolve conflicting testimony and weigh the evidence. See *State v. Wheeler*, 308 Neb. 708, 956 N.W.2d 708 (2021).

Moreover, the precise foreseeability question in this case was not whether it is foreseeable that sexual abuse of children can lead to suicide in general; it was whether it was foreseeable that Z.M. would commit suicide as a result of Matteson's abuse. And, on this question, it would not be unreasonable for a jury to conclude, based on evidence that Z.M. had previously attempted suicide as a result of Matteson's sexual abuse, that it was foreseeable that if Matteson sexually abused Z.M. again, she would again try to take her own life.

Because a jury could reasonably find that Z.M.'s death was a foreseeable consequence of Matteson's abuse, Matteson's reliance on *Lewis v. State*, 474 So. 2d 766 (Ala. Crim. App. 1985), does not aid him. In that case, the Court of Criminal Appeals of Alabama held that the child victim's decision to play Russian roulette was a superseding cause and thus that the defendant could not be found guilty of criminally negligent homicide on the theory that he showed the victim how to play the game. Although the court made some comments regarding the victim's exercise of "free will," it also stated that the defendant could not "have perceived the risk that the victim would play the game by himself." *Id.* at 771. In this case, our law holds that Z.M.'s suicide could constitute an efficient intervening cause only if it was not foreseeable.

See *State v. Irish*, 292 Neb. 513, 873 N.W.2d 161 (2016). And because a reasonable jury could find that Z.M.'s suicide was a foreseeable consequence of Matteson's abuse, there was sufficient evidence that Z.M.'s suicide was not an efficient intervening cause. Unpersuaded by Matteson's arguments, we find there was sufficient evidence of proximate causation to support Matteson's conviction for intentional child abuse resulting in death.

### 3. Proposed Jury Instruction

#### (a) Additional Background

After the close of evidence and during a jury instructions conference, Matteson proposed a jury instruction that specified that "[p]roximate cause" is conduct that produces a result "unbroken by an efficient intervening cause." The district court declined to give the proposed instruction and instead defined "proximate cause" without reference to "efficient intervening cause" in accordance with a Nebraska pattern jury instruction. The district court instructed the jury using the language of NJI2d Crim. 4.1B, which reads:

> Proximate cause—that is, a cause that produces a result in a natural and continuous sequence, and without which the result would not have occurred. Where the independent acts of more than one person combine to proximately cause the same injury, each such act is a proximate cause, and each such person may be held responsible for causing the result.

#### (b) Standard of Review

[6,7] Whether jury instructions given by a trial court are correct is a question of law. *State v. Cerros*, 312 Neb. 230, 978 N.W.2d 162 (2022). On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *Id.*

#### (c) Analysis

Matteson argues that the district court erred in refusing to give his proposed proximate cause instruction. He contends that the proximate cause instruction the district court gave prejudiced him, because it failed to refer to the concept of efficient intervening cause.

[8] A jury verdict will be reversed when the district court declines to give a proposed instruction only if (1) the proposed instruction correctly stated the law, (2) the proposed instruction was warranted by the evidence, and (3) the refusal to give the instruction prejudiced the defendant. See *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001), *modified on denial of rehearing* 261 Neb. 623, 633 N.W.2d 890. There is no prejudicial error warranting reversal if the jury instructions, read together and taken as a whole, correctly state the law, are not misleading, and adequately cover the issues supported by the evidence. See *State v. Pope*, 305 Neb. 912, 943 N.W.2d 294 (2020). If there is an applicable instruction in the Nebraska Jury Instructions, the court should usually give this instruction to the jury in a criminal case. *State v. Lavalleur*, 289 Neb. 102, 853 N.W.2d 203 (2014), *disapproved on other grounds* 292 Neb. 424, 873 N.W.2d 155 (2016).

While Matteson's proposed instruction correctly stated the law of proximate cause, so too did the instruction the jury received, such that Matteson was not prejudiced by the district court's refusal to give the proposed instruction. And the district court had good reason not to give the proposed instruction. This court has, in the civil context, instructed trial courts "to discontinue the practice of separately instructing juries on 'efficient intervening cause' in favor of the more direct and clear instructions based on the concept of proximate or concurring cause." *Sacco v. Carothers*, 253 Neb. 9, 18, 567 N.W.2d 299, 306 (1997). We reasoned that the concept of efficient intervening cause is "subsumed by" the concept of proximate cause itself: a cause that produces a result in a natural and continuous sequence is necessarily one that was

not interrupted by a so-called efficient intervening cause. *Id.* at 17, 567 N.W.2d at 306. We noted also that a "separate instruction on 'efficient intervening' cause is confusing to lay jurors" and distracts them from the ultimate question of whether the defendant proximately caused the injury. *Id.* at 18, 567 N.W.2d at 306. We see no reason why this same reasoning would not apply in the criminal context as well. Because we conclude there is no basis by which we could find that Matteson was prejudiced by the district court's instruction on proximate cause, this assignment of error lacks merit.

## 4. Evidence of Other Acts of Sexual Abuse

### (a) Additional Background

During the course of trial, the State introduced evidence that Matteson committed other acts of sexual abuse prior to the July 17, 2019, incident. Matteson's niece testified that Matteson groped her when she was 17 years old while she accompanied him on a 3- or 4-day trip in his semi-truck. According to Matteson's niece, she awoke one night while sleeping in the sleeper berth of the semi-truck to Matteson's giving her a "very deep massage" in between her legs. She testified that Matteson apologized to her the next morning. A friend of Matteson's niece also testified that the niece informed her of the abuse upon returning home from the trip.

In addition, the State introduced, and the district court received, a video recording of a forensic interview of Z.M. in 2015 during which she described past abuse by Matteson and claimed that Matteson did things "intimately" to Z.M.'s mother "in her sleep . . . when she d[id]n't want to do it." The district court admitted the video recording as "res gestae, part of the crime. And if not res gestae, it's at least 404(2)."

After the video recording was played for the jury, the district court instructed the jury that the recording of the forensic interview and the allegations of Matteson's niece were "received for a limited purpose of helping you decide whether

the defendant had motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident to commit the crime of child abuse."

### (b) Standard of Review

[9] Whether evidence is admissible for any proper purpose under the rule governing admissibility of evidence of other crimes, wrongs, or acts rests within the discretion of the trial court, and the trial court's decision is reviewed for abuse of discretion. See *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016).

### (c) Analysis

Matteson contends that the district court erred by receiving the evidence that Matteson had committed other acts of sexual abuse. He also claims that the district court committed plain error by not giving a limiting instruction following the testimony of his niece. We address these arguments here, beginning with his contention that the district court erred by receiving the niece's testimony.

### (i) Testimony of
### Matteson's Niece

[10] The district court received the testimony of Matteson's niece under Neb. Rev. Stat. § 27-404(2) (Reissue 2016), now codified at § 27-404(2) (Cum. Supp. 2022). Under that rule, the State cannot admit evidence of a defendant's prior bad acts to prove that he or she has a propensity to act in a certain manner, but such evidence is admissible for other purposes, such as to prove intent or absence of mistake. An appellate court's analysis under § 27-404(2) considers (1) whether the evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith; (2) whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice; and (3) whether the trial court, if requested, instructed the jury to consider the evidence only for the

limited purpose for which it was admitted. *State v. Chavez*, 281 Neb. 99, 793 N.W.2d 347 (2011).

Matteson's argument that the district court erred by admitting his niece's testimony under § 27-404(2) is made difficult by the fact that whether he "knowingly" and "intentionally" committed child abuse was a fact of consequence at trial. See, § 28-707(1) and (8); *Chavez, supra*. Moreover, one might reasonably conclude that previous subjection of a teenage blood relative to unwanted sexual touching made it more likely that Matteson's actions toward Z.M. on July 17, 2019, were committed knowingly and intentionally, as opposed to being the result of an accident or mistake. Matteson attempts to overcome the foregoing with a claim that, as a result of his plea to attempted incest and his statement at the plea hearing regarding that charge, his mental state was not a fact of consequence at trial. As we will explain, we are not persuaded.

First, despite Matteson's insistence to the contrary, we do not understand his statement at the plea hearing to be an admission that he knowingly and intentionally committed child abuse. Matteson asserted in his statement that he made "ill-advised comments or statements in an attempt to commit incest," but did not admit to knowingly and intentionally committing any of the acts of child abuse enumerated in § 28-707(1).

In addition, even if Matteson was willing to stipulate to knowing and intentional child abuse, that would not have precluded the State from presenting its case by other means. The State "may generally choose its evidence" in presenting the facts underlying a charged crime. *State v. Stubbendieck*, 302 Neb. 702, 712, 924 N.W.2d 711, 720 (2019). A defendant cannot negate the probative value of relevant evidence "through a tactical decision to stipulate." *Id.* See, also, *Old Chief v. United States*, 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997). We find no abuse of discretion in the admission of the testimony of Matteson's niece under § 27-404(2).

### (ii) Limiting Instruction Regarding
### Testimony of Niece

Matteson's next assignment of error also concerns his niece's testimony. Matteson urges us to find that the district court plainly erred by failing to instruct the jury as to the proper purposes for which it could consider his niece's testimony. Little need be said here.

Matteson asks us to find plain error because he did not request a limiting instruction regarding his niece's testimony. Our precedent, however, forecloses such an argument: We have said that the failure to provide a limiting instruction absent a request is not reversible error. See *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016). And, in any case, as we noted above, the district court, despite the absence of a request from Matteson, did instruct the jury that the niece's testimony, along with other § 27-404(2) evidence, was received for a limited purpose. Matteson's assignment of error lacks merit.

### (iii) Testimony of Niece's Friend

Matteson also assigns that the district court erred by permitting the friend of Matteson's niece to testify that Matteson's niece reported to the friend that Matteson had abused her. The district court admitted this hearsay testimony as admissible under the excited utterance exception to the hearsay rule. See Neb. Rev. Stat. § 27-803(1) (Reissue 2016), now codified at § 27-803(2) (Cum. Supp. 2022).

[11] We need not explore whether the district court erred in admitting the testimony of the niece's friend. Even assuming the testimony should not have been admitted, any such error was harmless. Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt. *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016).

Here, the testimony of Matteson's niece's friend was entirely cumulative of that of Matteson's niece. The friend, who was

not present when Matteson inappropriately touched his niece, did not testify about any fact regarding the incident to which the niece did not also testify. Moreover, as we have discussed above, other competent evidence supported Matteson's conviction. Any error in admitting the testimony of the niece's friend was harmless beyond a reasonable doubt.

### (iv) Video Recording of
### Forensic Interview

We next address Matteson's contention that the district court erred in receiving the video recording of Z.M.'s 2015 forensic interview. Matteson argues that the portions of the interview in which Z.M. referred to Matteson's abuse of her should have been ruled inadmissible for essentially the same reasons he argues that the district court should not have received the testimony from his niece. He also contends that Z.M.'s reference to Matteson's unwanted advances toward her mother was impermissible propensity evidence.

We again find no merit to Matteson's assignment of error. For the same reasons we discussed above with respect to the testimony of Matteson's niece, we find that the district court could receive evidence regarding Matteson's prior abuse of Z.M. as evidence tending to prove his intent and the absence of mistake or accident.

In addition, this evidence was also admissible as evidence of acts that were inextricably intertwined with the charged crime. Such evidence "forms part of the factual setting of the crime," and its admission may be "necessary for the prosecution to present a coherent picture of the charged crime." *State v. Lee*, 304 Neb. 252, 271, 934 N.W.2d 145, 160 (2019).

Z.M.'s claims that Matteson previously abused her fall squarely within the inextricably intertwined rule. The State's entire theory of proximate cause depended on a showing of prior abuse. According to the State, it was reasonably foreseeable that Matteson's abusive actions on July 17, 2019, would result in Z.M.'s death, because Z.M. had attempted

suicide following his initial abuse. To make that argument, the State needed to introduce evidence of Matteson's prior sexual abuse of Z.M. The recorded interview was that evidence—it "form[ed] part of the factual setting of the crime" for which Matteson stood trial. See *id.* The video recording was therefore highly probative on the question whether Matteson's child abuse resulted in Z.M.'s death. And any prejudice it caused Matteson was not unfair, because it did not invite the jury to convict Matteson on an improper basis. See *State v. Munoz*, 303 Neb. 69, 927 N.W.2d 25 (2019).

To the extent that Matteson argues that the video recording should have been excluded solely because of Z.M.'s statements regarding Matteson's unwanted sexual advances on her mother, that argument also fails. Matteson did not seek to redact that portion of the interview, a burden he bore. See *State v. Thomas*, 303 Neb. 964, 932 N.W.2d 713 (2019). "[A]n objection to an exhibit as a whole is properly overruled where a part of the exhibit is admissible." *Id.* at 981, 932 N.W.2d at 726.

Because the portions of the video recording concerning Matteson's abuse of Z.M. was admissible and Matteson did not specifically object to the admission of other parts of the recording, the district court did not abuse its discretion in admitting the recording in its entirety.

## 5. HANDWRITTEN JOURNAL

### (a) Additional Background

Matteson lastly contends that the district court erred in excluding from evidence a handwritten journal that was found inside the locked car where Z.M. died. The journal contains various entries dated from August 8 to September 4, 2019. In the journal, Z.M. writes about feeling stressed, emotional, angry, and confused, as well as about difficulties with her boyfriend. Several entries also refer to Matteson. One states, "[W]hen I think about what he put me through, I just get sick to my stomach." Another states, "He is my dad[,] but that doesn't change what he did. [D]oes he even know what he

put me through? Or how this might [affect] me for the rest of my life?"

Matteson attempted to admit the journal under the residual hearsay exception. See Neb. Rev. Stat. § 27-803(23) (Reissue 2016), now codified at § 27-803(24) (Cum. Supp. 2022). The district court explained that it would not admit the journal under the residual hearsay exception because it lacked sufficient guarantees of trustworthiness. The district court also stated that even if the entries were relevant, they would tend to confuse the jury and thus would also be excluded under Neb. Rev. Stat. § 27-403 (Reissue 2016).

### (b) Standard of Review

[12] We review rulings under the residual hearsay exception for abuse of discretion. See *State v. Martinez*, 306 Neb. 516, 946 N.W.2d 445 (2020).

### (c) Analysis

Matteson argues that the journal should have been admitted under the residual hearsay exception. The residual hearsay exception states, in full, that the following is not excluded by the hearsay rule:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (a) the statement is offered as evidence of a material fact, (b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (c) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his or her intention to

offer the statement and the particulars of it, including the
name and address of the declarant.

§ 27-803(24).

Before turning to Matteson's arguments, we stop to consider
what must be shown for a statement to be admitted under the
residual hearsay exception. We have said in recent years that to
determine whether a statement is admissible under the residual
hearsay exception, a trial court considers five factors derived
from § 27-803(24): a statement's trustworthiness, the materi-
ality of the statement, the probative importance of the state-
ment, the interests of justice, and whether notice was given to
an opponent. See, e.g., *Martinez, supra*. Our older case law
interpreting the residual hearsay exception, however, did not
describe the criteria to be considered as "factors," but, rather,
as "conditions precedent to admission." *State v. Reed*, 201
Neb. 800, 807, 808, 272 N.W.2d 759, 763 (1978). See, also,
*In re Estate of Schoch*, 209 Neb. 812, 817, 311 N.W.2d 903,
907 (1981) ("the proponent of the evidence had the burden of
establishing each of the conditions of admissibility imposed by
the [residual hearsay exception]").

Our shift from describing the rule as requiring the satis-
faction of "conditions precedent" to laying out five "factors"
seems to have occurred in *State v. Toney*, 243 Neb. 237, 498
N.W.2d 544 (1993). Even so, both cases that *Toney* cited
in explaining that proposition stated that the parallel federal
rule created "five requirements," not five "factors." *Id.*, citing
*United States v. Cree*, 778 F.2d 474 (8th Cir. 1985), and *Huff v.
White Motor Corp.*, 609 F.2d 286 (7th Cir. 1979).

[13] Upon reflection, we are convinced that our older
description of the rule as setting forth "conditions precedent
to admission" is more precise than our reference to "factors"
in *Toney, supra*, and its progeny. The text of § 27-803(24)
provides that the only statements eligible to be admitted under
the exception are those that have "equivalent circumstantial
guarantees of trustworthiness" as other hearsay statements
that are excepted from exclusion by a specific rule. The text

of § 27-803(24) also provides that the statement must (a) be offered as evidence of a material fact, (b) be more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, *and* (c) serve the general purposes of the rules of evidence and the interests of justice by its admission. Finally, the rule provides that a statement may not be admitted under the exception unless a notice requirement set forth in the rule is met. Under the plain text of § 27-803(24), a trial court does not weigh the criteria set forth in the rule as part of some sort of balancing test. Rather, the text provides that a hearsay statement must satisfy each of five statutory requirements before it can be admitted.

We note that our cases after *Toney, supra*, may have been imprecise in their terminology, but in practice, they treated the residual hearsay exception's notice provision as a mandatory requirement. In *State v. Martinez*, 306 Neb. 516, 946 N.W.2d 445 (2020), for example, we recited the proposition that called notice one of five "factors" to be weighed, but we treated notice instead like a prerequisite to admission. Stating that the notice requirement is "mandatory," we affirmed the exclusion of otherwise material evidence because the party seeking to introduce the hearsay statement under the residual exception failed to provide adequate notice of his intent to offer it. *Id.* at 532, 946 N.W.2d at 460. See, also, *State v. Castor*, 262 Neb. 423, 430, 632 N.W.2d 298, 305 (2001) ("[w]e need address only the notice requirement issue here, as our decision on that issue is dispositive"); *State v. Leisy*, 207 Neb. 118, 130, 295 N.W.2d 715, 723 (1980) ("[w]e hold that the notice requirement is mandatory"). Just as the text of the residual hearsay exception makes adequate notice mandatory, so too are each of the other statutory conditions made mandatory. A trial court cannot admit a hearsay statement under the residual hearsay exception unless it determines that all conditions have been met.

We find confirmation in our reading of the residual hearsay exception in decisions of federal courts of appeals applying the parallel federal rule. When a Nebraska Evidence Rule is substantially similar to a corresponding federal rule of evidence, we may look to federal decisions interpreting the corresponding federal rule for guidance in construing the Nebraska rule. *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008). Prior to recent amendments, the federal residual hearsay exception was almost identical to Nebraska's, and the current federal rule is substantially similar to ours. See Fed. R. Evid. 807. The federal courts of appeals have described the federal rule as, among other things, setting forth "foundational requirements," *U.S. v. W.B.*, 452 F.3d 1002, 1003 (8th Cir. 2006), and "five elements," *U.S. v. Moore*, 824 F.3d 620, 622 (7th Cir. 2016). See, also, *U.S. v. Slatten*, 865 F.3d 767, 806 (D.C. Cir. 2017) ("Rule 807 makes admissible a statement otherwise violative of the hearsay rule if the statement meets five criteria"); *U.S. v. Banks*, 514 F.3d 769, 777 (8th Cir. 2008) ("[i]n total, there are five requirements for admissibility under Rule 807").

Turning to Matteson's arguments that the journal should have been admitted under the residual hearsay exception, he argues that testimony of Z.M.'s mother about Z.M.'s writing in a journal establishes the trustworthiness of the journal. Z.M.'s mother testified that after Z.M's first suicide attempt, Z.M. received counseling, and that during that counseling, Z.M. learned "tools on how to deal with her anxiety [and] PTSD," including journaling. Matteson argues that this testimony demonstrates that the journal was "created by Z.M. for treatment purposes" and is thus trustworthy. Brief for appellant at 55.

We have recognized that in determining whether a statement has "equivalent circumstantial guarantees of trustworthiness," courts may consider a variety of factors affecting trustworthiness and may compare the declaration to the closest recognized hearsay exception. See *State v. Epp*, 278 Neb.

683, 773 N.W.2d 356 (2009). We understand Matteson's reference to the journal's being created "for treatment purposes" as an argument that the journal was trustworthy because the statements therein were similar to statements made for purposes of medical diagnosis or treatment, a specific, recognized hearsay exception. See § 27-803(4).

We do not believe Matteson has shown that the district court abused its discretion by finding that the journal lacked sufficient guarantees of trustworthiness. The rationale for the medical diagnosis or treatment exception to the hearsay rule is that it is in the self-interest of a patient seeking a diagnosis or treatment from a medical professional to provide accurate information such that statements made while seeking such a diagnosis or treatment are likely true. See *Vacanti v. Master Electronics Corp.*, 245 Neb. 586, 592, 514 N.W.2d 319, 324 (1994) ("[c]ommentators agree on the rationale for this hearsay exception: the reliability of statements for purposes of medical diagnosis or treatment is assured 'by the likelihood that the patient believes that the effectiveness of the treatment will depend on the accuracy of the information provided'"), quoting 2 McCormick on Evidence § 277 (John W. Strong 4th ed. 1992). See, also, *Ring v. Erickson*, 983 F.2d 818, 820 (8th Cir. 1992) (medical diagnosis or treatment exception "is based on the belief that a person seeking medical treatment is unlikely to lie to a doctor she wants to treat her, since it is in her best interest to tell the truth").

Matteson, however, does not direct us to any evidence in the record suggesting that the journal entries were written with the expectation they would be read by anyone else, much less a medical provider for purposes of diagnosis or treatment. And if, as Z.M.'s mother's testimony suggests, Z.M. made the journal entries, not for anyone else to read, but because the process of writing the entries helped with her anxiety, it is not obvious to us what guarantees their trustworthiness. Accordingly, we are not persuaded that Matteson has shown that the district court abused its discretion by finding

that the journal lacked sufficient guarantees of trustworthiness to be admitted under the residual hearsay exception.

## IV. CONCLUSION

As we have explained in this opinion, the child abuse resulting in death statute is not void for vagueness, there was sufficient evidence to support Matteson's conviction under that statute, and the district court did not commit reversible error in any of its jury instructions or evidentiary rulings challenged by Matteson. Accordingly, we affirm Matteson's convictions.

Affirmed.