### In re ROBERT B.

[Cite as *In re Robert B.*, 186 Ohio App.3d 389, 2009-Ohio-3644.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 23170.

Decided July 24, 2009.

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Kirsten Brandt, Assistant Prosecuting Attorney, for appellee.

Elizabeth R. Miller, for appellant.

FAIN, Judge.

{¶ 1} Appellant Robert B. appeals from juvenile court orders adjudicating him delinquent on two counts of carrying a concealed weapon, one count of obstructing official business, and one count of trafficking in cocaine. Following the adjudication, the juvenile court committed Robert to the Ohio Department of Youth Services ("DYS") for a minimum period of one year on the cocaine charge and a minimum of six months on each of the concealed-weapons charges. The commitment on one of the concealed-weapons charges is consecutive to the cocaine charge, and one is concurrent, with the maximum commitment period scheduled to end on Robert's 21st birthday. The juvenile court also admonished Robert concerning the obstruction charge.

{¶ 2} Robert contends that the trial court erred in adjudicating him delinquent on the counts of carrying a concealed weapon, because the state failed to prove every element of the charges by sufficient, competent, and credible evidence. Robert also contends that his trial counsel was ineffective, because counsel failed to raise the insufficiency of proof on the concealed-weapon charges, and because counsel waived opening statement and closing argument. Trial counsel also failed to present witnesses on Robert's behalf.

{¶ 3} We conclude that the evidence in the record is not sufficient to support the adjudication that Robert was delinquent for having committed two offenses of carrying a concealed weapon. The evidence would permit a finding that the weapons—two handguns—became concealed behind an open door when it was opened all the way to the wall, but the evidence does not permit a finding that their concealment was a result of Robert's voluntary act, since he was resisting the opening of the door. Trial counsel did not act ineffectively in waiving matters like opening statement and closing argument or in failing to call witnesses. Counsel's choices were a matter of trial tactics, there is no indication that

witnesses existed who would have aided Robert's case, and no prejudice has been demonstrated.

{¶ 4} The trial court's adjudication that Robert was delinquent by reason of having committed two acts that would constitute carrying a concealed weapon if committed by an adult is reversed. The trial court's other adjudications of delinquency are affirmed. This cause is remanded to the trial court for reconsideration of an appropriate disposition with respect to the surviving adjudications of delinquency.

## I

{¶ 5} In August 2008, Deputy Josh Hillard of the U.S. Marshal's Office was part of a task force called the Southern Ohio Fugitive Apprehension Strike Team ("Strike Team"). The Strike Team includes various local jurisdictions, and each jurisdiction brings in warrants. The Strike Team then prioritizes the warrants and goes out to look for fugitives. On August 19, 2008, the Strike Team went to 46 Fernwood Avenue in Dayton, Ohio, to look for Leon Coleman, who was wanted on a federal court warrant for failure to appear for arraignment. The Strike Team knew that the address was valid, because Coleman currently had service with Dayton Power & Light at the address.

{¶ 6} Hillard was dressed in full raid gear, including a vest marked with the designation "Police, U.S. Marshal." After the Strike Team knocked at the door, Coleman put half his body out of a second-floor window and made eye contact. Hillard informed Coleman that the police and U.S. Marshal were there and to come down and open the door. Coleman again made eye contact and closed the window. Hillard assumed that Coleman was coming down to open the door.

{¶ 7} Instead, another individual, Robert B., just barely opened the door. Robert looked at Hillard's marked vest and attempted to slam the door. Hillard was able to keep the door open, but could not make any progress forward, because Robert was fighting to shut the door. Two additional task members then helped Hillard push the door open. In the process, the officers pinned Robert between the door and the inside wall.

{¶ 8} As soon as the door flew open, Hillard saw a family room and began to cover the area, in case other people were there. The other officers struggled with Robert and immediately placed him in handcuffs, after they got him out from behind the door. A coffee table was located to the immediate right of the main entrance, about ten feet from the door. In plain view on the table were crack cocaine, digital scales, and some sandwich baggies.

{¶ 9} Hillard went upstairs, because he knew that Coleman was there. The officers found two additional people upstairs, as well as some weapons that were

in plain view. When Hillard went back downstairs, the officers decided to check behind the door where Robert had been pinned. At that time, the officers found two firearms: a Glock 19 9 mm pistol and a Taurus PT401 40–caliber pistol. The firearms could not be seen when the door was opened against the wall, but as soon as the door was moved, the weapons were in plain view on the floor. No one else had been in the doorway besides Robert.

{¶ 10} Officers from the Dayton Police Department were called to assist the Strike Team. When Officer Speelman of the Dayton Police Department arrived, Hillard showed him where the guns were located behind the door. Officer Speelman collected the guns and drugs, marked and tagged the weapons, and sent the drugs to the police laboratory. Speelman testified that the guns were within the immediate reach of someone located behind the door. Access would be gained by just bending down and picking up the weapons. The drugs were later identified as approximately 22 grams of crack cocaine.

{¶ 11} Speelman transported Robert to the Juvenile Justice Center, where everything was removed from Robert's pockets as part of the booking process. Speelman discovered that Robert had approximately $3,300 in cash in his pocket. Consequently, a canine unit was called, and the dog alerted on an envelope containing the money. This indicated to the dog's handler that the odor of narcotics was present.

{¶ 12} The state subsequently filed a complaint in juvenile court, alleging that Robert should be adjudicated delinquent, based on two counts of possession of a concealed weapon, one count of obstruction of official business, and one count of trafficking in cocaine. The trial court found that the allegations had been proven and adjudicated Robert delinquent. At the dispositional hearing, the court committed Robert to DYS for a minimum period of one and a half years and a maximum period to age 21. Robert appeals from the orders of adjudication and disposition.

## II

{¶ 13} Robert's first assignment of error is as follows:

{¶ 14} "The trial court violated Robert B.'s right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, Article I, Section 16 of the Ohio Constitution, and Juvenile Rule 29(E)(4) when it adjudicated him delinquent of carrying a concealed weapon absent proof of every element of the charge against him by sufficient, competent, and credible evidence."

{¶ 15} Under this assignment of error, Robert contends that the evidence is insufficient to meet the elements of carrying a concealed weapon, because the handguns were not concealed and were not "ready at hand."

{¶ 16} "A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387[, 678 N.E.2d 541]. The proper test to apply to the inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259[, 574 N.E.2d 492]: 'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Cherry,* 171 Ohio App.3d 375, 2007-Ohio-2133, 870 N.E.2d 808, at ¶ 9.

{¶ 17} The elements of the charge of carrying a concealed weapon are:

{¶ 18} "No person shall knowingly carry or have, concealed on the person's person or concealed ready at hand, any of the following:

{¶ 19} "(1) A deadly weapon other than a handgun;

{¶ 20} "(2) A handgun other than a dangerous ordnance;

{¶ 21} "(3) A dangerous ordnance." R.C. 2923.12(A).

{¶ 22} Robert contends that the handguns were not "ready at hand," because there was no evidence that he was standing in close proximity, other than when he was pinned against the wall where the guns were located. " 'Ready at hand' means so near as to be conveniently accessible and within immediate physical reach." *State v. Davis,* 115 Ohio St.3d 360, 2007-Ohio-5025, 875 N.E.2d 80, at ¶ 29, quoting from *State v. Miller,* Montgomery App. No. 19589, 2003-Ohio-6239, 2003 WL 22764120, at ¶ 14.

{¶ 23} The state presented evidence that the handguns were within Robert's immediate reach at the time he opened the door and while he struggled with the police. Consequently, a rational fact-finder could have found that the guns were "ready at hand."

{¶ 24} A weapon is considered to be concealed "if it is so situated as not to be discernible by ordinary observation by those near enough to see it if it were not concealed, who would come into contact with the possessor in the usual associations of life." *State v. Pettit* (1969), 20 Ohio App.2d 170, 174, 49 O.O.2d 200, 252 N.E.2d 325. We have stressed that "a concealed weapon may emerge into plain view for seizure purposes by the movement of a person or an object." *State v. Thornton* (May 4, 2001), Montgomery App. No. 18545, 2001 WL 468419.

For example, in Thornton, we concluded that a handgun had been concealed, when it was hidden from an officer's view until a passenger left the car. Likewise, in *State v. Bailey* (Aug. 21, 1998), Greene App. No. 97CA128, 1998 WL 892276, we concluded that a gun was concealed for purposes of R.C. 2923.12(A), where the officer could not see it until after he opened a car door and looked around the front of the vehicle.

{¶ 25} The crucial issue in this case is at what point, if any, were the handguns lying against the wall concealed. The state took the position at the oral argument that the guns were not concealed, for purposes of R.C. 2923.12, when the front door was closed, but that they became concealed as soon as Robert cracked open the door, even slightly, in response to the officer's knocking, since the guns were not in the officer's view at that point. We reject this argument, since it would have the result that virtually nothing in the front room behind the door could be deemed to have been in the plain view of the officers, since almost nothing would be visible through the minimal crack.

{¶ 26} We are of the view that the guns against the wall became concealed when the door opened all the way against the wall, pinning Robert against the wall. United States Deputy Marshal Joshua Hillard, who first noticed the guns, testified as follows:

{¶ 27} "Q. Were there any other areas of the house that you needed to clear?

{¶ 28} "A. After we had cleared the upstairs of persons and some weapons which were out in plain view, we walked down the stairs and decided to check behind the door where [Robert B.] had been pinned, and that's where we observed the two—two weapons, two firearms.

{¶ 29} "Q. What kind of firearms if you recall were found at the front door?

{¶ 30} "A. They were both pistols. One was a Glock 19[,] 9 millimeter, and the other was a Taurus PT 401 40–caliber pistol.

{¶ 31} "Q. And where were these at by the door?

{¶ 32} "A. Immediately behind the door. You could not observe the weapons with the door shut all the way, but as soon as you moved the door, they were right there on the floor."

{¶ 33} Hillard's testimony that the guns could not be observed with the door "shut" all the way is somewhat confusing. We construe this testimony to mean that with the door all the way open against the wall, where it had wound up following the struggle to enter, the guns were not visible behind the door, but that as soon as the door was moved, the guns were visible. Even if Hillard's use of the word "shut" is construed to mean literally that the door was closed, thereby separating the interior of the home from the outside world, which makes

little sense, his testimony would then represent a concession that the guns were immediately visible once the door was moved, which would mean that the guns were in plain view once the door was opened.

{¶ 34} We construe Hillard's testimony to mean that the guns against the wall were concealed only as a result of the door's having been opened all the way against the wall when the officers overcame Robert's resistance and pushed the door all the way open, pinning Robert against the wall.

{¶ 35} Criminal liability requires both of the following:

{¶ 36} "(1) The person's liability is based on conduct that includes either a voluntary act, or an omission to perform an act or duty that the person is capable of performing;

{¶ 37} "(2) The person has the requisite degree of culpability for each element as to which a culpable mental state is specified by the section defining the offense." R.C. 2901.21(A).

{¶ 38} R.C. 2901.21(B) then goes on to provide that a culpability state is not required for strict-liability offenses. But the requirement in R.C. 2901.21(A)(1) that an affirmative act forming the basis for criminal liability must be voluntary remains an independent requirement.

{¶ 39} In the case before us, it is clear that Robert resisted the opening of the door, with all his might, in fact, and that his resistance was overcome only when Hillard was assisted by other officers. It was a result of the officers' actions, which Robert resisted, that the door became open all the way against the wall, with the result that the guns became concealed. In reaching this conclusion, we do not, of course, condemn the actions of the officers, who were only performing their duty; nor do we commend the actions of Robert, who was resisting what he knew to be the actions of police officers performing their duties. Nevertheless, the process by which the guns came to be concealed behind the door was not the result of Robert's voluntary act, and he cannot, therefore, be held criminally liable for their concealment.

{¶ 40} Robert's first assignment of error is sustained.

## III

{¶ 41} Robert's second assignment of error is as follows:

{¶ 42} "Robert B. Was denied his constitution [sic] right to effective assistance of counsel, Fourteenth Amendment to the United States Constitution, Sections 10 and 16, Article I of the Ohio Constitution."

{¶ 43} Under this assignment of error, Robert contends that he was deprived of the effective assistance of trial counsel. Robert presents several reasons to

support this argument, including trial counsel's alleged failure to familiarize himself with the elements of carrying concealed weapons, counsel's waiver of both opening statement and closing argument, counsel's failure to call witnesses, and counsel's failure to obtain the results of fingerprint laboratory reports that could have absolved Robert of the concealed-weapons charge.

{¶ 44} In order to demonstrate ineffective assistance of counsel, Robert must show that his counsel's representation fell below an objective standard of reasonableness and that he has been prejudiced by the deficient performance. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *Bradley,* 42 Ohio St.3d at 142, 538 N.E.2d 373. Trial counsel is also entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Hindsight cannot distort the assessment of what was reasonable in light of counsel's perspective at the time, and debatable decisions about trial strategy cannot form the basis of a finding of ineffective assistance of counsel. Id.; *State v. King,* 179 Ohio App.3d 1, 2008-Ohio-5363, 900 N.E.2d 645, at ¶ 49.

{¶ 45} Any deficiencies in trial counsel's representation on the concealed-weapons charges are moot, in view of our disposition of Robert's first assignment of error.

{¶ 46} Trial counsel was not ineffective in failing to make an opening statement or closing argument, or in failing to call witnesses. The case was tried to an experienced judge, who was familiar with the issues and the law. See *State v. Dunlap,* Franklin App. No. 03AP–481, 2003-Ohio-6830, 2003 WL 22966830, at ¶ 30 (refusing to find ineffective assistance of counsel, based on waiver of closing argument, where the case was "a bench trial tried by an experienced trial judge who was well versed on the pertinent issues and the applicable law"). See also *State v. Barr,* Cuyahoga App. No. 89740, 2008-Ohio-2176, 2008 WL 1972738, at ¶ 14 (holding that waiver of opening statement is a matter of trial tactics, "especially in a bench trial"). Robert has not indicated what either an opening statement or closing argument would have added to his case, nor has he indicated how trial counsel's choice of tactics has caused prejudice.

{¶ 47} As a final matter, Robert has not suggested how witnesses might have aided his case. Robert did not testify, and the only people present at the scene were the police officers and the other people in the house, who were

presumably arrested as well. There is no indication in the record that any of these individuals would have provided favorable testimony. Accordingly, Robert's second assignment of error is overruled.

## IV

{¶ 48} Robert's first assignment of error having been sustained, and his second assignment of error having been overruled, that part of the judgment of the trial court adjudicating Robert to be delinquent by reason of having committed acts that, if committed by an adult, would constitute carrying a concealed weapon, is reversed; that part of the judgment of the trial court adjudicating Robert to be delinquent by reason of having committed acts that, if committed by an adult, would constitute obstructing official business and trafficking in cocaine, is affirmed; and this cause is remanded for reconsideration of an appropriate disposition on the surviving delinquency adjudications.

Judgment accordingly.

BROGAN and FROELICH, JJ., concur.