IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF NYREKO W.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF NYREKO W., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

NYREKO W., APPELLANT.


Filed July 1, 2025.    No. A-24-789.


Appeal from the Separate Juvenile Court for Lancaster County: ROGER J. HEIDEMAN, Judge. Affirmed.

Courtney B. Shanahan, of McHenry, Haszard, Roth, Hupp, Burkholder, Blomenberg & Camplin, P.C., for appellant.

Patrick F. Condon, Lancaster County Attorney, and Tara A. Parpart for appellee.


PIRTLE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

### INTRODUCTION

Nyreko W. appeals from the order of the separate juvenile court of Lancaster County adjudicating him to be a juvenile within the meaning of Neb. Rev. Stat. § 43-247(1) (Reissue 2016) because he subjected a female classmate to sexual contact, an act that would constitute a misdemeanor offense of third degree sexual assault. We affirm.

### BACKGROUND

This case stems from events that took place during a middle school field trip in February 2024. Nyreko was accused of touching a female classmate's intimate parts without her consent

outside of a bathroom at the field trip location and again on the bus ride back to school. Nyreko was 14 years old, and the female classmate, S.L., was 13 years old, at the time of the field trip.

On March 22, 2024, the State filed a petition in the juvenile court alleging that Nyreko was a juvenile within the meaning of § 43-247(1) because he subjected S.L. to sexual contact, an act that would constitute a misdemeanor offense of third degree sexual assault in violation of Neb. Rev. Stat. § 28-320(1) and (3) (Reissue 2016).

A contested adjudication hearing was held on September 25 and 26, 2024. Several witnesses testified, including S.L. and Nyreko, and numerous exhibits were received into evidence.

S.L. testified that in February 2024 she went on a class field trip to a college campus and Nyreko also went on that field trip. After eating lunch, S.L. went to use the bathroom and Nyreko started walking behind her. S.L. said that Nyreko stopped her and told her that he needed to tell her "'a secret.'" When S.L. "hunched over" and "guide[d] [her] ear over to him," Nyreko "pushed" her on the middle of her back so that she was "bent over" and he "started touching" her "butt" and her "vagina" over her clothes. S.L. "pushed [Nyreko] off" of her and told him, "I don't mess with that, that's weird and I don't do that." S.L. walked away and did not end up going to the bathroom because she "didn't feel comfortable" and "was just in shock." Instead, she "just went back to the teacher and [she] felt . . . safer by everyone else"; she did not tell the teacher what had happened. When asked if anyone else was around her near the bathroom when this happened, S.L. responded, "No."

After lunch, S.L.'s class got on the bus to go back to school. S.L. sat by the window in "the way back" and Nyreko sat next to her, closest to the aisle. S.L. said that during the bus ride, Nyreko asked her, "'Can I finger you?'" She told him, "No."

> [Nyreko] kept on grabbing my inner thigh and my thigh and I kept on slapping his hand away and pushing him away, and then he kept on grabbing my private front area and I told him to stop, and I told him that's weird and I kept on pushing him off of me.

She stated that Nyreko touched her "[o]ver" her clothes and she confirmed that by "private front area" she meant her vagina. S.L. was asked if Nyreko said anything while he was touching her. She responded, "He told me just to let it happen and he kept on repeating that, and I said, 'No', and I just kept on saying no and I told him that he was weird, and I kept on pushing him off of me." When asked, she said that she thought he touched her vagina "three times," and her inner thigh "two" times on the bus ride back to school. She felt "[s]cared, uncomfortable" while it was happening, and then she started crying. When they got back to school, they went inside and Nyreko "grabbed her hand" and told her, "'Just don't tell anyone,' . . . 'No one has to know.'" However, before the end of the school day S.L. told three other female students what had happened.

S.L. said she talked to school administrator Paige Suiter the next day or the day after about what had happened at lunch and on the bus. S.L. answered affirmatively when asked if she felt like she was still under the stress from this event when she told Suiter what had happened. S.L. "was kinda scared to tell [Suiter]" because she did not know what was going to happen, "but it felt better to tell her." S.L. cried when she spoke with Suiter.

Victoria E. is a friend and classmate of S.L. and was on the field trip. On the bus ride back to school, Victoria was sitting "[a]round the back" of the bus. She turned around once and saw "that [S.L.] looked uncomfortable"; S.L. was "making faces" at Nyreko. When asked if they were

"happy smiling faces," Victoria said "[n]o." Victoria said that when they got back to school, S.L. told her and another student that Nyreko had been "grabbing her leg inappropriately" on her "thigh"; S.L. was speaking quietly and was not smiling or crying.

Suiter is an instructional coordinator, "which is a type of administrator," at the middle school. Suiter did not go on the field trip. She testified that she spoke with S.L. the morning after the field trip. S.L. found Suiter in the hallway during a passing period, and Suiter told S.L "that I was going to wrap a few things up and then call her out of class so that she could tell me what was going on." In Suiter's office, S.L.'s demeanor was not "outgoing and bubbly" as usual, instead, S.L. "was crying on and off and seemed really down and depressed and nervous." "[W]hen she was giving me her statement about what happened, she at some point was not able to finish her sentences" and instead "would pause and kind of look down, hands in her lap, eyes down, head down, seemed kind of timid or nervous."

Over Nyreko's hearsay objection, Suiter testified that she and S.L. had

about a five-minute conversation, and she started telling me that everything was okay on the way to the field trip. Once they got there, they had finished eating lunch and she got up to use the restroom. She said that she didn't know [Nyreko] was behind her but that he had followed her to the restroom. At that point, he bent her over and started touching her. She asked him to stop, he said, "Just let it happen, just let it happen."

Suiter clarified that S.L. said Nyreko touched her "'[d]own there'" while "she motioned to her front" and that S.L. said he touched her "'over'" her clothes.

Suiter also testified that S.L. told her that Nyreko sat next to her on the bus.

[S.L.] said he started touching her inner thigh, she told him to stop. He asked her, "Can I finger you?", she said, "No, I don't do that." He said, "Come on, just let it happen, just let it happen". She reported that he was grabbing her wrist so that she couldn't block that area, and [S.L.] reported to me that his wrist grabbing was forceful, and he was not letting -- taking 'no' for an answer, and eventually she just started to let it happen and that's when she started crying and looking out the bus window.

S.L. stayed in Suiter's office for the rest of the school day. "[S.L.] was pretty shaken up and I could tell it wasn't going to be a productive day for her at school."

Nyreko's mother testified that "[a]fter the alleged [incident]," she was called to school "the next day." She was with Nyreko at the meeting when they were informed of an allegation that he had touched someone (they were not told who made the allegation). At the meeting, "[Nyreko] said nothing happened"; a law enforcement officer was present in the back of the room. However, later when they were in the car on their way home, Nyreko told his mother that he had touched S.L. on her buttocks by the bathroom. Nyreko's mother answered affirmatively when asked if Nyreko told her that, prior to going over to the bathroom, S.L. touched him first, had touched him multiple times during that field trip, and had rubbed her buttocks against him first. According to Nyreko's mother, prior to the day of the field trip, Nyreko and S.L. knew each other and would send messages to each other.

Jamar B. testified that he was on the field trip and had lunch with Nyreko, and that S.L. "walked up to [Nyreko]" during lunch. She "pushed [Nyreko's] arm . . . and started laughing" and

"then she had told all of us to come with her to get some ice cream, and . . . we all went with her." When asked if, at some point, S.L. walked away with Nyreko, Jamar replied, "Nah." On the bus ride back to school, Jamar sat in the seat in front of S.L. and Nyreko. Jamar talked to Nyreko on the way back to school and was able to see S.L. because "[he] got up and looked over the seat" two times. Jamar did not notice anything out of the ordinary when he looked over at S.L.; he said, "it looked chill to me."

Devven A. testified that he went on the field trip and sat in the last row of the bus on the way back to school, across the aisle from S.L. and Nyreko. Devven "[m]ostly talk[ed] to [Nyreko] the whole way back" and did not remember seeing anything out of the ordinary. He did not see Nyreko touch S.L. inappropriately and he did not see S.L. slap Nyreko's hands. Devven remembered telling a law enforcement officer that he thought S.L. and Nyreko were holding hands, "so I said, 'What are you doing with your hands?' His hands were in between them two. . . I don't think they were touching on her." Devven saw Nyreko's arm down to his wrist, but could not see down from his wrist, including his fingers. Devven did not see S.L. try to readjust or notice her trying to get anyone's attention.

Christian C. testified that he sat next to Devven on the bus ride back to school and he did not see Nyreko touch S.L.

Nyreko testified that he and S.L. went to school together for 1 year and were "flirtatious," "[l]ike, we were kinda more than friends, but we just didn't date." Nyreko and S.L. messaged over Snapchat and one of S.L.'s friends told him that S.L. wanted to date him. Nyreko said that S.L. would wink at him in school and he interpreted that to mean that she liked him.

Nyreko also testified about the February 2024 field trip. He said that S.L. approached him during lunch and pushed him on his shoulder. They walked away with a group and got ice cream, "and then me and her walked away on our own to get different foods." Nyreko and S.L. "held hands" while walking, something that S.L. initiated. When asked if there was any other touching before leaving the dining hall, Nyreko said, "We both had walked over by the bathroom together and we had hugged. After we had hugged, she turned around and brushed up against me," "[s]he put her bottom" on "my genital area." After S.L. rubbed up against his genital area twice, he touched her "butt." Nyreko denied pushing S.L.'s shoulders down, touching her vagina, or telling her to "Just let it happen." He also denied that S.L. ever slapped his hands or tried to move away from him. She was laughing and smiling and did not appear to be either upset or uncomfortable. After that, it was time to leave the field trip.

Nyreko testified that he and S.L. got on the bus together and she asked him to sit with her. They sat in the last row, with S.L. by the window and him by the aisle. On the way back to school, Nyreko talked to the other students sitting around him. He also took pictures with other students, including S.L., while on the bus. He denied that he ever grabbed S.L. by the wrists, touched her genital area, or did anything to S.L. against her will. He also denied that S.L. ever slapped his hands away from her, seemed upset or uncomfortable, cried, or tried to get anyone's attention. According to Nyreko, after they got back to school, S.L. did not indicate that she was upset with him, and she talked to him in their remaining classes that day. S.L. was "[j]ust her old plain laughful self." On cross-examination, Nyreko was asked, "[Y]ou're testifying that nothing happened on the bus, correct?" He responded, "Yes."

Nyreko went to the school administration the next day "right after first period" because rumors about the field trip began spreading and the information "was not true." Nyreko also had a meeting with his parents, a school administrator, and a law enforcement officer present; despite being asked by his parents multiple times during the meeting, he did not admit to touching S.L. Later, after leaving the meeting, Nyreko told his mother what happened "because I felt comfortable there."

In its journal entry and order entered on September 26, 2024, the juvenile court found that the State met its burden of proof and adjudicated Nyreko to be a child as described in § 43-247(1).

Nyreko appeals.

## ASSIGNMENTS OF ERROR

Nyreko assigns that the juvenile court erred in (1) receiving certain testimony by Suiter over his hearsay objection and (2) finding there was sufficient evidence to adjudicate him. He also assigns (3) that he received ineffective assistance of counsel at the adjudication hearing because trial counsel failed to object to S.L.'s hearsay testimony.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jeovani H.*, 316 Neb. 723, 6 N.W.3d 539 (2024). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of facts over the other. *Id.*

## ANALYSIS

### SUITER'S TESTIMONY

Nyreko claims the juvenile court erred in receiving Suiter's testimony as to what S.L. told her the day following the field trip. At the adjudication hearing, Nyreko objected to Suiter's testimony based on hearsay, and the State responded that it was allowed as an "excited utterance"; the juvenile court overruled the objection. Nyreko argues on appeal that S.L.'s statements were not made until the following day, after she "had the evening for conscious reflection about the event." Brief for appellant at 15. He also claims that S.L. only disclosed information to Suiter in response to questioning by Suiter, "not under the stress or shock of the alleged incidents." *Id*. The State contends Suiter's testimony about S.L.'s statements were properly admitted as an excited utterance.

The adjudication portion of hearings shall be conducted before the court without a jury, applying the customary rules of evidence in use in trials without a jury. Neb. Rev. Stat. § 43-279(1) (Cum. Supp. 2024). Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Neb. Rev. Stat. § 27-801(3) (Cum. Supp. 2024). Hearsay is not admissible except as provided by these rules, by other rules adopted by the statutes of the State of Nebraska, or by the discovery rules of the Supreme Court. Neb. Rev. Stat. § 27-802 (Reissue 2016). The excited utterance exception to the hearsay rule can be found in Neb. Rev. Stat. § 28-803(2) (Cum. Supp. 2024). See *State v. Matteson*, 313 Neb. 435, 985 N.W.2d 1 (2023).

We need not explore whether the juvenile court erred in admitting the testimony of Suiter as to what S.L. told her the day after the field trip. Even assuming the testimony should not have been admitted, any such error was harmless. Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt. *State v. Matteson, supra* (district court permitted friend of defendant's niece to testify that defendant's niece reported to the friend that defendant had sexually abused her; district court admitted the hearsay testimony as admissible under excited utterance exception; the Nebraska Supreme Court found that even assuming the testimony of the niece's friend should not have been admitted, any such error was harmless because the testimony of the niece's friend was entirely cumulative to that of the niece). In this case, any error in admitting Suiter's testimony was harmless beyond a reasonable doubt because Suiter's testimony was merely cumulative to that of S.L.'s testimony.

SUFFICIENCY OF EVIDENCE

Pursuant to § 43-247(1), the juvenile court in each county shall have jurisdiction of any juvenile who has committed an act other than a traffic offense which would constitute a misdemeanor or an infraction under the laws of this state, or violation of a city or village ordinance, and who was 11 years of age or older at the time the act was committed. When an adjudication is based upon § 43-247(1), the allegations must be proven beyond a reasonable doubt. See § 43-279(2).

Here, Nyreko was 14 years old at the time he was alleged to have subjected S.L. to sexual contact, an act that would constitute a misdemeanor offense of third degree sexual assault in violation of § 28-320(1) and (3). Nyreko argues that the State did not present sufficient evidence to meet the elements of third degree sexual assault, and therefore the State did not prove beyond a reasonable doubt that he was a child as described in § 43-247(1).

Section 28-320 states:

(1) Any person who subjects another person to sexual contact (a) without consent of the victim, or (b) who knew or should have known that the victim was physically or mentally incapable of resisting or appraising the nature of his or her conduct is guilty of sexual assault in either the second degree or third degree.

. . . .

(3) Sexual assault shall be in the third degree and is a Class I misdemeanor if the actor shall not have caused serious personal injury to the victim.

Pursuant to § 28-318(5):

Sexual contact means the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. Sexual contact also means the touching by the victim of the actor's sexual or intimate parts or the clothing covering the immediate area of the actor's sexual or intimate parts when such touching is intentionally caused by the actor. Sexual contact includes only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party. Sexual contact also includes the touching of a child with the actor's sexual or intimate parts on any part of the child's body for purposes

of sexual abuse by a school employee under section 28-316.01 or sexual assault of a child under sections 28-319.01 and 28-320.01[.]

Intimate parts means the genital area, groin, inner thighs, buttocks, or breasts. § 28-318(2). And pursuant to § 28-318(8):

Without consent means:

(a)(i) The victim was compelled to submit due to the use of force or threat of force or coercion, or (ii) the victim expressed a lack of consent through words, or (iii) the victim expressed a lack of consent through conduct, or (iv) the consent, if any was actually given, was the result of the actor's deception as to the identity of the actor or the nature or purpose of the act on the part of the actor;

(b) The victim need only resist, either verbally or physically, so as to make the victim's refusal to consent genuine and real and so as to reasonably make known to the actor the victim's refusal to consent; and

(c) A victim need not resist verbally or physically where it would be useless or futile to do so[.]

Nyreko argues that the State failed to prove that the contact (1) was for the purpose of sexual arousal or gratification and (2) the contact was without S.L.'s consent. We disagree. S.L. testified that, by the bathroom, Nyreko "pushed" her on the middle of her back so that she was "bent over" and he "started touching" her "butt" and her "vagina" over her clothes. S.L. "pushed [Nyreko] off" of her and told him, "I don't mess with that, that's weird and I don't do that." S.L. also testified that later, on the bus ride, Nyreko asked her, "'Can I finger you?'" She told him "[n]o." However, he "kept on grabbing [her] inner thigh and [her] thigh," she "kept on slapping his hand away and pushing him away." He then "kept on grabbing [her] private front area," meaning her vagina, over her clothes and she "kept on pushing him off" of her; he told her to "'just let it happen.'"

Based on S.L.'s testimony, Nyreko subjected her to sexual contact without her consent--either by touching her "butt" and her "vagina" over her clothes by the bathroom, or by "grabbing [her] inner thigh" and vagina on the bus. During both incidents, S.L. expressed her lack of consent by her words and her actions. By the bathroom, she "pushed [Nyreko] off" of her and told him, "I don't mess with that, that's weird and I don't do that." On the bus, she told him "no" and she slapped his hands away and pushed him away from her. Although Nyreko argues that there was "[n]o evidence demonstrated that Nyreko had an erection or was otherwise sexually aroused," brief for appellant at 23, Nyreko's conduct could nevertheless be reasonably construed as being for the purpose of sexual arousal or gratification. Nyreko agreed that there was a "mutual interest" between S.L. and him, and he acknowledged that they hugged "over by the bathroom" and that S.L. "put her bottom on [his] private." After that, he agreed that he touched S.L.'s "butt." Nyreko repeatedly told S.L. to "'let it happen.'" Then, later at the school, he told her, "'Just don't tell anyone,' . . . 'No one has to know.'" As pointed out by the State, Nyreko's "conduct, coupled with his statements, can be reasonabl[y] construed as for the purpose of sexual arousal and gratification." Brief for appellee at 19-20.

We conclude that the evidence was sufficient to prove the elements of third degree sexual assault, and therefore the evidence was sufficient to support the adjudication of Nyreko.

INEFFECTIVE ASSISTANCE OF COUNSEL

Nyreko claims that he received ineffective assistance of counsel at his adjudication hearing because his trial counsel failed to object to S.L.'s hearsay testimony.

Neither party directs us to a Nebraska case where an ineffective assistance of counsel claim has been applied to a juvenile delinquency adjudication. Notably, juvenile proceedings are not criminal prosecutions. *In re Interest of Jordan B.*, 300 Neb. 355, 913 N.W.2d 477 (2018). But the United States Supreme Court and the Nebraska Supreme Court have found that juveniles facing delinquency adjudications are entitled to certain constitutional rights, just like adults. "A proceeding where the issue is whether the child will be found to be 'delinquent' and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution." *In re Gault*, 387 U.S. 1, 36, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967). A juvenile offender in a delinquency adjudication in which the juvenile's freedom could be curtailed has the same constitutional rights as an adult with regard to four specific due process rights: (1) to receive notice of the charges, (2) to be represented by counsel, (3) to confront and cross-examine witnesses, and (4) to invoke the privilege against self-incrimination. *In re Interest of Jordan B., supra*. See, also, *In re Gault,* 387 U.S. at 36-37 ("the juvenile needs the assistance of counsel to cope with problems of law, to make skilled inquiry into the facts, to insist upon regularity of the proceedings, and to ascertain whether he has a defense and to prepare and submit it"); *Kent v. United States*, 383 U.S. 541, 554, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966) (with respect to waiver by Juvenile Court to adult court of jurisdiction over offense committed by youth, "there is no place in our system of law for reaching a result of such tremendous consequences without ceremony—without hearing, without effective assistance of counsel, without a statement of reasons").

Courts in other states have found that juveniles facing delinquency adjudications have the right to the *effective* assistance of counsel. See, *JP v. State*, 514 P.3d 785 (Wyo. 2022) (at adjudication stage, juvenile facing delinquency proceedings has right to effective assistance of counsel under Sixth and Fourteenth Amendments to United States Constitution and Article 1, § 10 of Wyoming Constitution); *In re R.D.B.*, 102 S.W.3d 798 (Tex. App. 2003) (juvenile entitled to effective assistance of counsel). But *cf. In re Interest of Joshua R. et al.*, 265 Neb. 374, 657 N.W.2d 209 (2003) (parent had no constitutional right to effective assistance of counsel in termination of parental rights proceeding). And the test in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), has been applied to ineffective assistance of counsel claims in juvenile delinquency adjudication cases in other jurisdictions. See, *JP v. State, supra*; *In re Robert B.*, 186 Ohio App. 3d 389, 928 N.E.2d 746 (2009); *In re R.D.B., supra*.

Assuming, without deciding, that juveniles facing delinquency proceedings in Nebraska have a constitutional right to the *effective* assistance of counsel, Nyreko's claim of ineffective assistance of counsel is without merit.

Nyreko argues that his trial counsel was ineffective by failing to object to S.L.'s testimony that when they were by the bathroom, she told Nyreko, "'I don't mess with that, that's weird and I don't do that.'" Brief for appellant at 27. He also takes issue with his counsel failing to object to S.L.'s testimony that when they were on the bus, she told Nyreko, "'no,' 'to stop,' and that 'he

- 8 -

was weird.'" *Id.* Nyreko contends that "[t]hese statements are clearly hearsay because they were made outside of court and offered for their truth, and no foundation was laid for a hearsay exception to apply," but counsel did not object. *Id.*

In response, the State claims that S.L.'s statements were not hearsay and were therefore admissible. The State argues that when an out-of-court statement is not offered to prove the truth of the matter asserted, the statement is not hearsay, and for a nonhearsay statement to be admissible, it must be offered for one or more of the recognized nonhearsay purposes relevant to an issue in the case. "One of the recognized nonhearsay purposes is words that constitute a verbal act," which is "'a statement that has legal significance, i.e., it brings about a legal consequence simply because it was spoken.'" Brief for appellee at 24, quoting *State v. McCave*, 282 Neb. 500, 805 N.W.2d 290 (2011). Here, "The existence of a statement manifesting a lack of consent is relevant to whether a sexual assault has occurred," and "[b]y speaking words that express a lack of consent the statement itself brings about a legal consequence because a defendant's conduct then becomes a sexual assault." Brief for appellee at 24. "Therefore, a victim's statement expressing a lack of consent is a verbal act because it has legal significance independent of the truth of the matter asserted." *Id.* We agree with the State that S.L's statements constituted a verbal act and were not hearsay.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Neb. Rev. Stat. § 27-801(3) (Cum. Supp. 2024).

> If an out-of-court statement is not offered for proving the truth of the facts asserted, it is not hearsay. But it does not necessarily follow that such a statement is admissible in a particular case. Apart from statements falling under the definitional exclusions and statutory exceptions, the admissibility of an out-of-court statement depends upon whether the statement is offered for one or more recognized nonhearsay purposes relevant to an issue in the case.

*State v. McCave*, 282 Neb. at 531, 805 N.W.2d at 316-17. One recognized nonhearsay purpose is to show a verbal act. See *id.*

The Nebraska Supreme Court has explained that words that constitute a verbal act are not hearsay even if they appear to be. *Id.* "A verbal act is a statement that has legal significance, i.e., it brings about a legal consequence simply because it was spoken." *Id.* at 531, 805 N.W.2d at 317. Where testimony is offered to establish the existence of a statement rather than to prove the truth of that statement, the hearsay rule does not apply. *Id.* This statement does not mean that any out-of-court statement is admissible to show that it was made. *Id.* But a nonhearsay purpose for offering a statement does exist when a statement has legal significance because it was spoken, independent of the truth of the matter asserted. *Id.* Whether such words have a legal effect does not depend upon the out-of-court declarant's credibility. *Id.* And whether the trier of fact finds that the words were spoken depends upon the in-court witness' credibility. *Id.* But that finding is a separate issue from whether the words had legal significance independent of their truth. *Id.*

The Nebraska Supreme Court has set forth the following rule: "A statement offered to prove its impact on the listener, instead of its truth, is offered for a valid nonhearsay purpose if the listener's knowledge, belief, response, or state of mind after hearing the statement is relevant to an

- 9 -

issue in the case." *State v. McCave*, 282 Neb. at 533-34, 805 N.W.2d at 318. In *McCave*, the defendant's stepmother's out-of-court statements giving the defendant permission to be on the property were "verbal acts" relevant to the central issue in the trespass case -- i.e., whether the defendant intended to be on the property knowing that he was not licensed or privileged to do so -- and thus the statements were not inadmissible as hearsay.

In the instant case, S.L.'s statements to Nyreko when they were by the bathroom (i.e., "'I don't mess with that, that's weird and I don't do that'") and on the bus (i.e., "'no,' 'to stop,' and that 'he was weird'") were relevant to whether Nyreko subjected S.L. to sexual contact, knowing that his actions were "without [her] consent." Because S.L.'s statements to Nyreko constituted "verbal acts," the statements were not inadmissible as hearsay. Accordingly, any hearsay objection by Nyreko's trial counsel would have been overruled.

Further, even if the statements would have been inadmissible hearsay, there was no prejudice or harm to Nyreko because although S.L.'s statements established that Nyreko acted "without consent," that element was also established by S.L.'s physical actions during the incidents, i.e., when she "pushed [Nyreko] off" of her, and when she "kept on slapping his hand away and pushing him away."

## CONCLUSION

We conclude that the State adduced sufficient evidence to prove beyond a reasonable doubt that Nyreko subjected S.L. to third degree sexual assault. Accordingly, we affirm the juvenile court's order adjudicating him to be a child within the meaning of § 43-247(1).

AFFIRMED.